Kody GARHART, a minor, by and through his parents and next friends, Jennifer TINSMAN and Kip Garhart; and Jennifer Tinsman, individually, Plaintiffs–Appellants/Cross–Appellees

v.

COLUMBIA/HEALTHONE, L.L.C., d/b/a North Suburban Medical Center, Defendant–Appellee/Cross–Appellant.

No. 02SA182.

Supreme Court of Colorado,
En Banc.

June 28, 2004.

As Modified on Denial of Rehearing
Aug. 16, 2004.

Bogue, Koury & Marylander LLC, Grant Marylander, Denver, Colorado, Irwin & Boesen, P.C., Kirk D. Tresemer, Brad R. Irwin, Attorneys for Plaintiffs–Appellants/Cross–Appellees.

Davis Graham & Stubbs, Andrew Low, Vinineath Nuon Gopal, Denver, Colorado, Dickinson, Prud'Homme, Adams & Ingram, LLP, Gilbert Dickinson, Attorneys for Defendant–Appellee/Cross–Appellant.

Kennedy & Christopher, P.C., John R. Mann, Denver, Colorado, Attorney for Amicus Curiae, COPIC Insurance Company.

McDermott, Hansen & McLaughlin, LLP, William J. Hansen, Denver, Colorado, Attorney for Amicus Curiae, Colorado Trial Lawyers Association.

Montgomery Little & McGrew, P.C., Patrick T. O'Rourke, Greenwood Village, Colorado, Attorney for Amicus Curiae, Colorado Medical Society.

Justice HOBBS delivered the opinion of the court.

We accepted this appeal in a medical malpractice case pursuant to section 13–4–102(1)(b), 5 C.R.S. (2003), which allows us to proceed directly when a trial court has declared a statute to be unconstitutional.[1] Re-

1. The parties raise eleven issues:

Issues on Appeal:

1. Whether this court should reconsider the decision in *Scholz v. Metropolitan Pathologists, P.C.*, 851 P.2d 901 (Colo.1993), and hold that, based upon the language of article II, section 23, the intent of the framers and the people, and the circumstances under which section 23 was adopted, section 23 guarantees a right to jury trial in civil actions.

2. Whether the Colorado Health Care Availability Act's ("HCAA") arbitrary reduction of a jury's award of damages violates section 23 by depriving the parties of their right to have a jury calculate and assess damages.

3. Whether the HCAA's damage limitations improperly violate the Constitution's separation of powers by (1) usurping the judiciary's exclusive role of reviewing and, where appropriate, remitting damages awarded by a jury, and (2) depriving plaintiffs of their judicially-guaranteed right to a jury trial.

4. Whether the HCAA's statutory limitations on damages violate the United States and Colorado's guarantees of equal protection by infringing upon a fundamental right without any evidence of a compelling state interest.

5. Whether the General Assembly's failure to provide for cost of living adjustments for the HCAA damage limitations while requiring them for similar damage limitations in other tort actions violates equal protection.

Issues on Cross–Appeal:

1. Should the judgment in favor of a child and his mother for injuries suffered during childbirth be reversed and dismissed due to lack of any evidence of causation, where: (a) as to the child, the claim against the Hospital was that its nurses should have called the doctor sooner, but there was no evidence whatsoever that the doctor would have done anything differently even if she had been called earlier; and (b) as to the mother, it was undisputed that her injuries were caused solely by the delivery of the baby vaginally, rather than by cesarean section, and there was no evidence whatsoever that any conduct of the nurses employed by the Hospital caused the doctor not to perform a cesarean?

2. Did the trial court err in refusing to instruct the jury that the doctors had a duty to advise the mother of the substantial risks of attempting a vaginal delivery in light of her inability to deliver either of her first two children vaginally, where it was undisputed that the mother's and baby's injuries would have been avoided entirely if the doctors had delivered the baby by cesarean section without prolonged labor?

3. Did the trial court err in refusing to instruct the jury to apportion the baby's damages, where plaintiffs claimed that the baby suffered neurological injuries at two different times during the labor and delivery, and it was undisputed that the second incident was attributable solely to the doctors?

4. Where the jury was instructed to calculate the present value of future damages awarded to the child, did the trial court err in excluding the Hospital's evidence of the cost of an annuity from a major life insurance company, payable for the remainder of the child's life, which tended to indicate a present value substantially less than that calculated by plaintiff's expert?

5. Where the governing statute provides that a plaintiff in a medical malpractice action may recover no more than $250,000 in noneconomic damages from all defendants combined, did the trial court err in permitting a plaintiff to recover the entire $250,000 from the Hospital alone, where

lying on the court of appeals opinion in *Rodriguez v. HealthONE*, 24 P.3d 9 (Colo.App. 2000), the trial court in this case declared the periodic payment provision of section 13–64–205(1)(f), 5 C.R.S. (2001), which is applicable to people under the age of twenty-one and incapacitated adults, to be unconstitutional.[2] In *HealthONE v. Rodriguez*, 50 P.3d 879 (Colo.2002), we subsequently reversed the court of appeals and upheld the statute's periodic payment provision. We adhere to our decision in *Rodriguez*.

Nonetheless, plaintiffs Jennifer Tinsman (Tinsman) and Kody Garhart, through his parents and next friends (Garhart), raise numerous other constitutional challenges to the Health Care Availability Act (HCAA), all of which we reject.

For its part, North Suburban Medical Center (Hospital) seeks to set aside or modify the Tinsman and Garhart medical malpractice damage awards, based on alleged trial court errors. We reject all of the Hospital's challenges to the trial court rulings, except that we order apportionment of Garhart's and Tinsman's noneconomic damages and economic damages that the district judge has not, or cannot, exempt from the economic damages cap, after application of the HCAA damage caps rather than before, and order periodic payments of Garhart's future damages.

For purposes of our analysis and holdings, we group the numerous issues into constitutional challenges and trial ruling challenges.

As to the Tinsman and Garhart constitutional challenges to the HCAA, we hold: (1) Tinsman and Garhart have standing to raise their constitutional challenges to the HCAA; (2) the periodic payment requirement of section 13–64–205(1)(f), 5 C.R.S. (2001) is not unconstitutional; (3) the HCAA damages caps of section 13–64–302(1)(b) (total damages limited to $1,000,000 per patient and noneconomic damages limited to $250,000 per patient) do not violate the Colorado Constitution's right to a jury trial in a civil case, because there is no such constitutional right; (4) these HCAA damages caps do not infringe impermissibly on the judicial remittitur authority; (5) these HCAA damages caps do not violate separation of powers by contravening this court's rules regarding jury trial and the trial court's role in entering judgment and ruling on post-trial motions set forth in C.R.C.P. 38, 39(a), 58, and 59; (6) these HCAA damages caps do not violate constitutional equal protection provisions based on an alleged fundamental right to a jury trial in a civil case, because there is no such Colorado constitutional right; and (7) as to the equal protection claim involving an inflationary adjustment to the noneconomic damages cap, we find no disparate treatment because the inflationary adjustment provision of the general negligence act applies only to claims that accrue on or after January 1, 1998.

As to the Hospital's trial ruling challenges, we hold (1) there was sufficient evidence of the Hospital's negligence and proximate cause for the injuries and damages to send the Tinsman and Garhart claims to the jury; (2) the trial court did not abuse its discretion in refusing to instruct the jury on a duty of

---

two co-defendants settled before trial, and the jury assigned a portion of the fault to the settling defendants?

6. Did the district court err in declaring unconstitutional the statutory requirement that an incapacitated plaintiff be paid damages for future medical expenses and future lost earnings in periodic payments, rather than in lump sum, where this Court subsequently held this statute to be constitutional?

2. Section 13–64–205(1)(f) reads:

(1) In order to determine what judgment is to be entered on a verdict requiring findings of special damages under this part 2, the court shall proceed as follows:

. . .

Within no more than three months after the entry of verdict by the trier of fact and before the court enters judgment for periodic payments, the plaintiff who meets the criteria set forth in this subsection (1) may elect to receive the immediate payment to the plaintiff of the present value of the future damage award in a lump-sum amount in lieu of periodic payments. In order to exercise this right, the plaintiff must:

(I) Have reached his twenty-first birthday by the time the periodic payment order is entered;

(II) Not be an incapacitated person, as defined in section 15–14–102(5), C.R.S.; and

(III) Have been provided financial counseling and must be making an informed decision.

the non-party doctors to gain Tinsman's informed consent before proceeding with a vaginal birth instead of a cesarean section delivery; (3) the trial court did not err when it refused to instruct the jury to apportion Garhart's damages between hypoxia during labor and subsequent shoulder dystocia; (4) the trial court did not err when it excluded evidence regarding the cost of an annuity to help establish the present value of Garhart's future damages; but (5) the trial court erred by not applying the jury's apportionment percentages for party and non-party defendants to the capped noneconomic damages award and the capped economic damages awards that the district judge has not, or cannot, exempt from the economic damages cap; and (6) the trial court erred by ordering Garhart's future damages to be paid in a lump sum, rather than in the form of periodic payments.

Accordingly, we affirm in part and reverse in part. We instruct the trial court to: (1) order periodic payment of Garhart's future damages; and (2) calculate the apportionment of Garhart's and Tinsman's noneconomic damages and economic damages that the district judge has not, or cannot, exempt from the economic damages cap, after application of the HCAA damages caps rather than before, using the jury's apportionment percentages for party and non-party defendants.

## I.

### Background

#### A. Facts

On September 4, 1996, Tinsman gave birth to Garhart. When Tinsman entered the Hospital on September 3, 1996, her pregnancy with Garhart was proceeding normally. The delivery was terribly complicated by actions of the nurses, doctors, and the Hospital. As a result, Tinsman suffered severe pelvic damage during the delivery, and Garhart incurred severe cerebral palsy from birth trauma. Garhart's condition also includes impairment of fine and gross motor skills; mental retardation; a brachial plexus injury, which renders his left arm essentially non-

functional; moderate to severe hearing loss; and seizure disorder.

Garhart is Tinsman's third child. She delivered her first two children by cesarean section (c-section). Despite Tinsman's inclination to have a third cesarean delivery, her primary obstetrician, Dr. Volin, recommended she attempt vaginal delivery. Tinsman agreed. Due to Dr. Volin's absence on vacation, his associate Dr. Monica Abarca attended Garhart's birth. Dr. Abarca had recently completed her residency training.

The Hospital assigned Nurse Sunny Powell to the Tinsman delivery. Nurse Powell had fourteen years of labor and delivery experience and had completed advanced courses in fetal monitoring.

At 9:32 a.m. on September 3, 1996, Tinsman went into labor and was admitted to the Hospital. Garhart was a normal, healthy, full-term fetus. Upon admission, the Hospital attached Tinsman to a fetal monitor, which continually printed a strip to chart the fetal heartbeat and the mother's uterine contractions. The purpose of this fetal monitoring is to monitor for fetal asphyxia and optimize the child's delivery.

At 10:45 p.m. on September 3, the fetal monitoring strip data for Garhart was somewhat abnormal, but within acceptable parameters. Nevertheless, Dr. Abarca noted that she would proceed towards a c-section delivery procedure if increased medication did not further Tinsman's labor. Dr. Abarca then went to the call room to take a nap. At 11:15 p.m., Nurse Powell called Dr. Abarca to notify her of "mild to moderate variable decelerations." [3]

By this time, the fetal monitoring strip data showed that Garhart might be in trouble from fetal hypoxia and acidosis. But, Nurse Powell did not ask Dr. Abarca to come look at the fetal monitor strip and did not call Dr. Abarca again until 12:45 a.m. on September 4.

During the hour and a half after Nurse Powell notified Dr. Abarca of the decelerations in Garhart's monitoring strip data and before she again called Dr. Abarca, several

---

**3.** Deceleration refers to the falling rate of the fetus's heartbeat.

events took place. From 11:15 to 11:24, the monitoring strip data indicated a sharp decline in Garhart's condition. By 11:24, the strip data showed that the umbilical cord was compressed, resulting in a severe lack of oxygen to Garhart's brain. The monitoring strip data continued to worsen from this point on.

At 11:45 p.m., Nurse Powell began giving oxygen to Tinsman. After the strip data showed another severe deceleration at 11:50, she turned Tinsman onto her left side in an attempt to relieve pressure from the umbilical cord. These interventions did not improve Garhart's monitoring strip data.

At 12:30 a.m., Nurse Powell turned Tinsman onto her right side. The decelerations continued. The monitoring strip data showed Garhart to be in severe trouble. By this time, he needed immediate assistance and, likely, had already sustained permanent brain damage.

Nurse Powell finally summoned Dr. Abarca at approximately 12:45 a.m. Dr. Abarca arrived and determined to proceed with an expeditious vaginal delivery. Tinsman pushed repeatedly. Dr. Abarca resorted to using forceps. After three pulls, Garhart was not yet free; his shoulder stuck on his mother's pelvic bone—a condition called shoulder dystocia. After four or five minutes more, Dr. Abarca succeeded in dislodging Garhart. Born at 1:32 a.m., he was clinically dead at birth.

Resuscitation procedures began. Fifteen minutes later, Garhart first showed signs of living. Within five hours he developed seizures. A CT scan disclosed severe cerebral edema from oxygen deprivation during delivery, and brachial plexus due to shoulder dystocia.

Garhart's birth trauma left him with feeding through a plastic tube that goes directly into his stomach. He is now seven years old and wears diapers; cannot walk; and cannot speak. He does have some recognition of his environment, his family, and his caregivers. His severe impairment is for life.

Tinsman suffered three separate hernias and a uterine prolapse. She underwent a hysterectomy and pelvic reconstructive surgery, but she continues to have chronic pain and permanent incontinence.

## B. Procedural Context

This case originally proceeded against Dr. Volin, Dr. Abarca, and the Hospital.[4] Dr. Volin and Dr. Abarca settled. The Hospital endorsed both doctors as non-party tortfeasors. Based on the actions of the Hospital's nursing staff, the jury found the Hospital to be negligent, with the negligence causing injury to Tinsman and Garhart.

The jury determined the Hospital to be responsible for sixty percent of Garhart's injuries and forty percent of Tinsman's injuries, and completed a special verdict form detailing the damages due to each of these plaintiffs.

The court then entered a judgment against the Hospital for the amounts the jury awarded, reduced by the percentage of fault assigned to the Hospital for each plaintiff. The following chart illustrates the jury's verdict and the court's initial order.

| | Kody Garhart | 60% Fault | Jennifer Tinsman | 40% Fault |
|---|---|---|---|---|
| **Present:** Economic losses for essential home care services | 50,000 | 30,000 | 0 | 0 |
| **Present:** Noneconomic losses, including pain and suffering, inconvenience, emotional stress, and impairment of quality of life | 1,000,000 | 600,000 | 100,000 | 40,000 |
| **Present:** Noneconomic losses for physical impairment and disfigurement | 0 | 0 | 1,000,000 | 400,000 |
| **Future:** Medical and other health care expenses | 4,800,000 | 2,880,000 | 75,000 | 30,000 |

4. Pursuant to the doctrine of respondeat superior, the Hospital is liable for any negligence of its staff, which includes Nurse Powell as well as other nurses involved with the delivery of Garhart.

| | | | | |
|---|---|---|---|---|
| **Future:** Lost earnings and earning capacity | 1,500,000 | 900,000 | 0 | 0 |
| **Future:** Economic losses other than those included in above 2 categories | 545,000 | 327,000 | 100,000 | 40,000 |
| **Future:** Noneconomic losses, including pain and suffering, inconvenience, emotional stress, and impairment of quality of life | 4,000,000 | 2,400,000 | 500,000 | 200,000 |
| **Future:** Noneconomic losses for physical impairment and disfigurement | 500,000 | 300,000 | 10,000 | 4,000 |
| **TOTALS:** | 12,395,000 | 7,437,000 | 1,785,000 | 714,000 |

The Hospital filed a motion requesting the district court to apply the HCAA damage caps[5] and mandate periodic payment of future damages.[6] After an appeal to the court of appeals, not at issue here, the trial court entered an order amending the judgment. It ordered the Hospital to pay Garhart's future damages in one lump sum and applied the $250,000 HCAA noneconomic damages cap.

Because Tinsman's total award was less than $1,000,000, and her noneconomic losses award was less than $250,000, as calculated by the trial court, the HCAA damage caps did not apply to her.

The following chart illustrates the trial court's amended judgment as to Garhart. The trial court invoked the economic damages exception to the $1,000,000 cap, section 13–64–302(1)(b).

| | Total Award | 60% Fault | After HCAA |
|---|---|---|---|
| **Present:** Economic losses for essential home care services | 50,000 | 30,000 | 30,000 |
| **Present:** Noneconomic losses, including pain and suffering, inconvenience, emotional stress, and impairment of quality of life | 1,000,000 | 600,000 | 250,000 |
| **Present:** Noneconomic losses for physical impairment and disfigurement | 0 | 0 | 0 |
| **Future:** Medical and other health care expenses | 4,800,000 | 2,880,000 | 2,880,000 |
| **Future:** Lost earnings and earning capacity | 1,500,000 | 900,000 | 900,000 |
| **Future:** Economic losses other than those included in above 2 categories | 545,000 | 327,000 | 327,000 |
| **Future:** Noneconomic losses, including pain and suffering, inconvenience, emotional stress, and impairment of quality of life | 4,000,000 | 2,400,000 | 0 |
| **Future:** Noneconomic losses for physical impairment and disfigurement | 500,000 | 300,000 | 300,000 |
| **TOTALS:** | 12,395,000 | 7,437,000 | 4,687,000 |

When the court added costs and interest to the awards, the resulting combined judgment award against the Hospital was $7,663,377.13. Garhart:

5. Section 13–64–302, 5 C.R.S. (2001), provided that no award shall exceed $1,000,000, of which not more than $250,000 shall be attributable to noneconomic loss. The provision contains an exception where the court may, if it determines good cause exists, allow the total award to exceed $1,000,000; however, the $250,000 cap still applies for noneconomic damages. The statute has since been amended to allow for $300,000 in noneconomic damages. Ch. 271, sec. 4, § 13–64–302, 2003 Colo. Sess. Laws 1787, 1789. Pursuant to our holding in *Preston v. Dupont*, 35 P.3d 433 (Colo.2001), the court did not include the noneconomic losses for physical impairment and disfigurement in the total noneconomic losses subject to the $250,000 cap; therefore Garhart's $300,000 award in that category remained intact while the other two categories of noneconomic damages were reduced to a total of $250,000. In 2003, the General Assembly passed a statute that overruled our decision in *Preston;* however, this statute was prospective and is thus inapplicable to the case at bar. Ch. 271, sec. 4, § 13–64–302, 2003 Colo. Sess. Laws 1787.

6. Section 13–64–205 mandates payment of future damages in the form of periodic payments.

| Award: | 4,687,000.00 |
|---|---|
| Interest: | 1,710,570.18 |
| Total: | 6,397,570.18 |

Tinsman:

| Award: | 714,000.00 |
|---|---|
| Interest: | 355,668.09 |
| Total: | 1,069,668.09 |
| Costs: | 196,138.86 |
| Total: | $7,663,377.13 |

The trial court found section 13–64–205(1)(f)(I), providing for periodic payments, to be unconstitutional, relying on the court of appeals opinion in *Rodriguez v. HealthONE*, 24 P.3d 9 (Colo.App.2000), a decision we later reversed. We then accepted jurisdiction over this appeal.

We proceed to address the constitutional issues, then the trial court's rulings.

## II.

### The Constitutional Issues

Garhart and Tinsman raise a number of constitutional challenges to the HCAA. Contrary to the Hospital's contention, we determine that they have standing to do so, but we reject all of these constitutional challenges.

### A. Standing

■ The Hospital argues that Garhart and Tinsman lack standing to assert the constitutional issues they raise in this appeal. Their constitutional objections to the HCAA center on the damages caps of section 13–64–302(1)(b) (total damages limited to $1,000,000 per patient and noneconomic damages limited to $250,000 per patient).[7] Because standing is a threshold issue we address it first. *HealthONE v. Rodriguez*, 50 P.3d 879, 892 (Colo.2002).

The $1,000,000 total damages cap of section 13–64–302(1)(b) contains an exception that the trial court may invoke for good cause to allow a damages award above that limit to reflect loss of future earnings, or for future medical and other health care costs, or both. In arguing against standing, the Hospital points out that the trial court entered judgment for Garhart, relieving him of the $1,000,000 cap, and Tinsman's total damages did not reach this cap.

■ In Colorado, parties to lawsuits benefit from a relatively broad definition of standing. *Ainscough v. Owens*, 90 P.3d 851, 855 (Colo.2004). We follow a two-part test to determine standing. Parties have standing if they have: (1) suffered an injury in fact; and (2) the harm is to a legally protected interest. *Wimberly v. Ettenberg*, 194 Colo. 163, 168, 570 P.2d 535, 539 (1977).

While neither Garhart nor Tinsman was affected in this case by the $1,000,000 cap, the court did apply the $250,000 cap to limit Garhart's award. And, both Tinsman and Garhart raise an equal protection claim re-

---

**7.** The full text of section 13–64–302(1)(b) provides:

The total amount recoverable for all damages for a course of care for all defendants in any civil action for damages in tort brought against a health care professional, as defined in section 13–64–202, or a health care institution, as defined in section 13–64–202, or as a result of binding arbitration, whether past damages, future damages, or a combination of both, shall not exceed one million dollars, present value per patient, including any claim for derivative noneconomic loss or injury by any other claimant, of which not more than two hundred fifty thousand dollars, present value per patient, including any derivative claim by any other claimant, shall be attributable to noneconomic loss or injury, whether past damages, future damages, or a combination of both; except that if, upon good cause shown, the court determines that the present value of the amount of lost past earnings and the present value of lost future earnings, or the present value of the amount of past medical and other health care costs and the present value of the amount of future medical and other health care costs, or both, when added to the present value of other past damages and the present value of other future damages, would exceed such limitation and that the application of such limitation would be unfair, the court may award the present value of additional future damages only for loss of such excess future earnings, or such excess future medical and other health care costs, or both. The limitations of this section are not applicable to a health care professional who is a public employee under the "Colorado Governmental Immunity Act" and are not applicable to a certified health care institution which is a public entity under the "Colorado Governmental Immunity Act." For purposes of this section, "present value" has the same meaning as that set forth in section 13–64–202(7). The existence of the limitations and exceptions thereto provided in this section shall not be disclosed to a jury.

§ 13–64–302(1)(b), 5 C.R.S. (2003).

garding the lack of an inflationary adjustment that the General Assembly afforded to other negligence awardees but prohibited for HCAA awardees.

Moreover, their constitutional challenge to the HCAA damages caps pivots on an asserted right to jury trial in civil cases. If it exists, such a right is among those citizens may vindicate as "an interest in having a government that acts within the boundaries of our state constitution," as we said in *Ainscough*, 90 P.3d at 856.

Garhart and Tinsman have alleged facts sufficient to meet both prongs of our Colorado jurisprudential standing requirement.

### B. No Colorado Constitutional Right to a Jury Trial in Civil Cases

■ Garhart and Tinsman contend that the Colorado Constitution establishes a right to a jury trial in both criminal and civil cases. Based thereon, they argue the HCAA damages caps impermissibly infringe on their right to receive the award the jury reached in its verdict. In making this argument, Garhart and Tinsman would have us overrule *Scholz v. Metropolitan Pathologists, P.C.*,

851 P.2d 901 (Colo.1993), and hold that article II, section 23 of our constitution guarantees a right to a jury trial in civil cases.

Examining the language of our constitution in *Scholz*, we held that the "inviolate" language regarding the right to a jury in criminal cases without the same reference being made to civil cases clearly preserved a jury trial right only in criminal cases.

Our constitution provides:

The right of trial by jury shall remain inviolate in criminal cases; but a jury in civil cases in all courts, or in criminal cases in courts not of record, may consist of less than twelve persons, as may be prescribed by law.

Colo. Const. art. II, § 23.[8]

In *Scholz*, we conducted a thorough review of our precedent. While the language in our constitution refers to civil cases in allowing the membership of the jury to be less than twelve, this allowance did not impliedly mean that the constitution provided a right to jury trial in civil cases. Rather, the General Assembly may establish such a right by statute.[9]

---

8. This section has remained unchanged since 1877.

9. *See State Farm Mut. Auto. Ins. Co. v. Broadnax*, 827 P.2d 531, 537 (Colo.1992) (recognizing that the Colorado Constitution does not guarantee a right to a jury trial in civil cases); *Mountain States Tel. & Tel. Co. v. DiFede*, 780 P.2d 533, 540 (Colo.1989) ("Trial by jury in civil actions is not a matter of right in Colorado."); *Firelock, Inc. v. Dist. Court*, 776 P.2d 1090, 1097 (Colo.1989) ("There is no constitutional right to a jury trial in civil cases."); *Blades v. DaFoe*, 704 P.2d 317, 320 (Colo.1985) ("Trial by jury in a civil case is not a constitutional right."); *In re Estate of Daniels*, 665 P.2d 594, 597 (Colo.1983) ("Litigants are not entitled to a jury trial in civil cases as a matter of constitutional right."); *Kaitz v. Dist. Court*, 650 P.2d 553, 554 (Colo.1982) ("In Colorado there is no constitutional right to a trial by jury in a civil action."); *Fed. Lumber Co. v. Wheeler*, 643 P.2d 31, 34 (Colo.1981) ("There is no constitutional right to a trial by jury in civil actions."); *Gleason v. Guzman*, 623 P.2d 378, 382 (Colo.1981) ("There is no constitutional right to a jury trial in civil cases in Colorado."); *Setchell v. Dellacroce*, 169 Colo. 212, 215, 454 P.2d 804, 806 (1969) ("Under our state constitution, trial by a jury in a civil action or proceeding is not a matter of right."); *Jones v. Lambourn's Estate*, 159 Colo. 246, 252, 411 P.2d 11, 15

(1966) ("Our state constitution does not require a jury trial in civil cases or in probate proceedings."); *Johnson v. Neel*, 123 Colo. 377, 387, 229 P.2d 939, 944 (1951) ("Trial by jury in civil actions is not a matter of right in Colorado."); *Parker v. Plympton*, 85 Colo. 87, 95, 273 P. 1030, 1033 (1928) (holding that our constitution does not provide for a jury trial in civil actions as a matter of right); *Kahm v. People*, 83 Colo. 300, 303, 264 P. 718, 719 (1928) ("Under our constitution trial by jury in a civil action or proceeding is not a matter of right, but our general assembly may provide for it."); *Parker v. McGinty*, 77 Colo. 458, 462, 239 P. 10, 12 (1925) ("The Colorado Constitution, art. 2, § 23 secures the right of trial by jury in criminal cases, but imposes no restriction upon the Legislature in respect to the trial of civil causes."); *Miller v. O'Brien*, 75 Colo. 117, 118, 223 P. 1088, 1088 (1924) ("There is no constitutional right to a trial by jury in civil cases in this state."); *Corthell v. Mead*, 19 Colo. 386, 388, 35 P. 741, 741 (1894); *Londoner v. People*, 15 Colo. 557, 570, 26 P. 135, 139 (1881) ("Our constitution does not declare that a jury may either be demanded or denied as a matter of course in the trial of civil cases; hence this is a proper subject for statutory regulation."); *Huston v. Wadsworth*, 5 Colo. 213, 216 (1880) ("Section 23 of the bill of rights, referred to in appellant's brief, secures the right of trial by jury in criminal cases, but imposes no restriction upon

Because the Colorado constitutional right to a jury applies to criminal cases, not civil cases, we hold that the HCAA damages caps do not impermissibly infringe on the right to jury trial in this state.

## C. The HCAA Does Not Violate Separation of Powers by Usurping a Trial Court's Right to Review a Jury Award

Garhart and Tinsman argue that the HCAA cap on noneconomic damages violates the separation of powers doctrine by invading the judiciary's role in two respects: (1) by mandating a judgment the court must enter and interfering with the remittitur authority of the courts; and (2) by contravening our court's rules regarding jury trial and the trial court's role in entering judgment and ruling on post-trial motions as set forth in C.R.C.P. 38, 39(a), 58, and 59. We disagree. The HCAA's noneconomic damages caps do not violate separation of powers principles.

■■■ Pursuant to article VI, section 1 of the Colorado Constitution, the judicial branch is charged with construing the meaning of the constitution. *Bd. of County Comm'rs v. Vail Assocs., Inc.*, 19 P.3d 1263, 1272 (Colo.2001). We presume that a statute is constitutional; unless the conflict between the constitution and the law is clear and unmistakable, we will not disturb the statute. *City of Greenwood Village v. Petitioners for Proposed City of Centennial*, 3 P.3d 427, 440 (Colo.2000); *see also Bd. of County Comm'rs v. Vail Assocs., Inc.*, 19 P.3d at 1272 ("We typically accord to legislative enactments a presumption of constitutionality."). The party challenging the constitutionality of a statute bears the burden of proving it unconstitutional beyond a reasonable doubt. *Scholz v. Metro. Pathologists, P.C.*, 851 P.2d 901, 905 (Colo.1993).

### 1. Remittitur

■ Garhart and Tinsman rely primarily on *Best v. Taylor Machine Works*, 179 Ill.2d 367, 228 Ill.Dec. 636, 689 N.E.2d 1057 (1997), for the proposition that the HCAA usurps the judiciary's power of remittitur by establishing a "legislative remittitur." In *Best*, the Illinois Supreme Court found a statutory noneconomic damages cap unconstitutional for interference with the traditional remittitur power of the judiciary:

> [W]e conclude that [the statute] undercuts the power, and obligation, of the judiciary to reduce excessive verdicts. In our view, [the statute] functions as a "legislative remittitur." Unlike the traditional remittitur power of the judiciary, the legislative remittitur of [the statute] disregards the jury's careful deliberative process in determining damages that will fairly compensate injured plaintiffs who have proven their causes of action. The cap on damages is mandatory and operates wholly apart from the specific circumstances of a particular plaintiff's noneconomic injuries. Therefore, [the statute] unduly encroaches upon the fundamentally judicial prerogative of determining whether a jury's assessment of damages is excessive within the meaning of the law.

*Id.*, 228 Ill.Dec. 636, 689 N.E.2d at 1080.

We decline to follow the Illinois case. Several other jurisdictions have held otherwise. The Nebraska Supreme Court has analyzed the Illinois Supreme Court's decision as being contrary to a majority of the states. *Gourley v. Nebraska Methodist Health Sys., Inc.*, 265 Neb. 918, 663 N.W.2d 43, 76 (2003). *Gourley* holds that a statutory damages cap is not judicial-type remittitur; instead, such a limitation is a legitimate exercise of legislative power. *Id.* at 77.[10] We agree, and join

the legislature in respect to the trial of civil causes."). *But see City of Denver v. Hyatt*, 28 Colo. 129, 63 P. 403 (1900).

**10.** Other state supreme courts have held that a legislative damage cap does not act as a legislative remittitur. *Evans v. State*, 56 P.3d 1046, 1055 (Alaska 2002) ("The damage caps cannot violate the separation of powers, because the caps do not constitute a form of remittitur.");

*Kirkland v. Blaine County Med. Ctr.*, 134 Idaho 464, 4 P.3d 1115, 1122 (2000) (holding that legislative caps do not infringe on judiciary's power of remittitur); *Pulliam v. Coastal Emergency Serv.*, 257 Va. 1, 509 S.E.2d 307, 319 (1999) (Legislative damage caps do not invade the province of the judiciary.); *Verba v. Ghaphery*, 210 W.Va. 30, 552 S.E.2d 406, 411 (2001) (Legislature may set reasonable limits on damage caps in civil actions without violating separation of powers principles.); *Guzman v. St. Francis*

those states that have upheld damages caps as not infringing impermissibly on the judicial role in the separation of powers.

■ A remittitur is "[t]he process by which a court reduces or proposes to reduce the damages awarded in a jury verdict." Black's Law Dictionary 1298 (7th ed.1999). In Colorado, a court may exercise its power of remittitur by setting aside a verdict in a personal injury case if the award is either grossly and manifestly excessive or inadequate. *Burns v. McGraw–Hill Broad. Co.,* 659 P.2d 1351, 1355–56 (Colo.1983).

The HCAA simply imposes a cap on an award; the trial court still retains its authority to reduce by remittitur an award it determines to be excessive in light of the evidence before the jury. The HCAA cap applies equally to all medical malpractice personal injury plaintiffs, whereas remittitur operates on a case-by-case analysis.

■ Section 2–4–211, 1 C.R.S. (2003), recognizes that Colorado adopts the common law insofar as it is applicable and of a general nature. *Salazar v. Davidson,* 79 P.3d 1221, 1230 n. 5 (Colo.2003); *Goldberg v. Musim,* 162 Colo. 461, 470–71, 427 P.2d 698, 703 (1967). The General Assembly may effectuate changes to the common law by specific legislation. *Bayer v. Crested Butte Mountain Resort, Inc.,* 960 P.2d 70, 74–77 (Colo. 1998). Having established a statutory cause of action for medical malpractice, the General Assembly may prescribe reasonable limits on the amount of damages recoverable under the statute. *See Franklin v. Mazda Motor Corp.,* 704 F.Supp. 1325, 1336 (D.Md.1989).

### 2. C.R.C.P. 38, 39(a), 58, and 59

■ Garhart and Tinsman assert that the HCAA violates separation of powers, in that it improperly interferes with our trial by jury provisions in C.R.C.P. 38 and 39(a).

*Hosp., Inc.,* 240 Wis.2d 559, 623 N.W.2d 776, 787 (2000) ("The statute setting a cap on noneconomic damages does not interfere with this right; a trial court retains the discretion ... to order a remittitur.").

11. The constitution vests rule making authority in our court:

C.R.C.P. 38 outlines when a party has a right to a trial by jury and C.R.C.P. 39(a) addresses when trial is to a jury rather than the court. Colorado Trial Lawyers Association, Amicus Curiae in this case, extends the separation of powers argument to the court's power to enter judgments on jury verdicts pursuant to C.R.C.P. 58 and to correct excessive verdicts pursuant to C.R.C.P. 59.

The argument is that the HCAA infringes on our constitutional rule making authority pursuant to article VI, section 21, by taking the determination of noneconomic damages away from a jury.[11] Rule 58 states that a trial court must promptly enter a judgment based on a jury's verdict. But, the HCAA damages caps forces a court to enter a judgment based not on a jury's verdict, but on a statute. Because, according to this argument, the statute in effect nullifies a rule promulgated by our court, Garhart and Tinsman assert this result constitutes a separation of powers violation.

■ We disagree. The HCAA damages caps do not nullify our rules, and they involve a substantive exercise of the General Assembly's power to define and limit a cause of action. *See People v. McKenna,* 199 Colo. 452, 456, 611 P.2d 574, 577 (1980). If a statute is substantive, and not a legislative attempt to regulate the operation of the courts, it will typically not impinge on our constitutional rule making authority. *Id.* at 456–57, 611 P.2d at 577.

In order to determine if the HCAA is substantive, we are guided by the legislative declaration. *Scholz v. Metro. Pathologists, P.C.,* 851 P.2d 901, 905 (Colo.1993). The legislative declaration for the HCAA states that the purpose of the statute is to assure the continued availability of adequate health care services by containing the increasing cost of medical malpractice insurance:

> The supreme court shall make and promulgate rules governing the administration of all courts and shall make and promulgate rules governing practice and procedure in civil and criminal cases, except that the general assembly shall have the power to provide simplified procedures in county courts for the trial of misdemeanors.
> Colo. Const. art. VI, § 21.

The general assembly determines and declares that it is in the best interests of the citizens of this state to assure the continued availability of adequate health care services to the people of this state by containing the significantly increasing costs of malpractice insurance for medical care institutions and licensed medical care professionals, and that such is rationally related to a legitimate state interest. To attain this goal and in recognition of the exodus of professionals from health care practice or from certain portions or specialties thereof, the general assembly finds it necessary to enact this article limited to the area of medical malpractice to preserve the public peace, health, and welfare.

§ 13–64–102(1), 5 C.R.S. (2003). This legislative declaration clearly conveys a legislative public policy concern. Additionally, the United States Supreme Court has implied that a statutory cap on damages would constitute substantive law for the purpose of *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 428, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996).

Accordingly, we hold that the HCAA damages caps do not violate the separation of powers doctrine by either creating a legislative remittitur or by infringing on our rule making authority pursuant to article VI, section 21 of the Colorado Constitution.

### D. The HCAA Does Not Violate Equal Protection by Infringing on a Fundamental Right to a Jury Trial

■ The United States Constitution provides that "[no] state ... shall deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. Article II, section 25 of the Colorado Constitution is our state's counterpart to the federal guarantee. Whether we review an equal protection claim under a rational basis test or a strict scrutiny standard depends upon the nature of the right involved. *Culver v. Ace Elec.*, 971 P.2d 641, 645 (Colo. 1999). Unless a legislative classification involves a suspect class or abridges a fundamental right, we apply the rational basis standard. *Id.* at 646.

■ Garhart and Tinsman argue that the right to a jury trial is a fundamental right, which the HCAA abridges by means of the damages caps. However, in *Scholz,* we held that the rational basis test applies to the HCAA. *Scholz,* 851 P.2d at 906 ("The HCAA does not infringe on a fundamental right, nor does it create a classification based on race, religion, national origin, or gender. Thus, the HCAA must be reviewed under the rational basis test."). We recently reiterated that the rational basis test applies to HCAA equal protection claims. *See HealthONE v. Rodriguez,* 50 P.3d at 893.

Under the rational basis test, the party asserting the statute's unconstitutionality must show that the classification "lacks a legitimate governmental purpose and, without a rational basis, arbitrarily singles out a group of persons for disparate treatment in comparison to other persons who are similarly situated." *Culver,* 971 P.2d at 646. In *Scholz,* we thoroughly reviewed the HCAA under the rational basis test and held that it does not violate equal protection principles. *Scholz,* 851 P.2d at 906–07.

Garhart and Tinsman recognize that we upheld the HCAA damage caps in *Scholz,* but nonetheless ask us to reconsider that holding. We decline to do so. Today, we also reaffirm our precedent that there is no right to a jury trial in civil cases; hence, the General Assembly is not constrained for this reason when enacting causes of action and limitations upon them.

### E. Garhart and Tinsman Have Not Shown Disparate Treatment for the Purposes of Equal Protection

■ Pursuant to the Fourteenth Amendment of the United States Constitution, no state may deny any person the equal protection of the laws. Article II, section 25 of the Colorado Constitution also guarantees the right to equal protection. *Sigman v. Seafood Ltd. P'ship I,* 817 P.2d 527, 532 (Colo.1991). Equal protection guarantees assure that people who are similarly situated will receive similar treatment under the law. *Id.*

Because personal injury plaintiffs are not a suspect class and the statute does not implicate a fundamental right, we review under the rational basis test. *Culver v. Ace Elec.*, 971 P.2d 641, 645–46 (Colo.1999). Under this test, Garhart and Tinsman must show that the classification serves no legitimate governmental purpose and arbitrarily singles out people in similar situations for disparate treatment. *Id.* at 646. We presume a statute is constitutional; the party alleging that the statute is unconstitutional has the burden to prove its unconstitutionality beyond a reasonable doubt. *Sigman*, 817 P.2d at 531.

In 1997, the legislature enacted H.B. 97–1239. This legislation, codified in pertinent part at section 13–21–102.5(3)(c), provided for an inflationary adjustment to the noneconomic damages cap in negligence cases, but specifically exempted the HCAA noneconomic damages cap from the inflationary adjustment. § 13–21–102.5(3)(c)(IV). Garhart and Tinsman assert that because the noneconomic damages cap for some negligence actions was adjusted for inflation, but the HCAA cap was not, they are treated differently from others who were injured by negligence without any rational basis for such disparate treatment. Garhart and Tinsman argue that victims of medical malpractice who suffer noneconomic damages in excess of $250,000 are similarly situated to those who suffer noneconomic damages as a result of other negligent acts.

We determine that Garhart and Tinsman have not established that they were treated differently from other persons whose causes of action accrued at the same time as theirs.

House Bill 97–1239, which adjusted the noneconomic damages cap in other negligence actions, applies only to claims for relief that accrue on or after January 1, 1998. Ch. 172, sec. 4, § 13–21–102.5, 1997 Colo. Sess. Laws 921, 923; *see also* § 13–21–102.5(3)(c)(III), 5 C.R.S. (2003). A claim for relief accrues when a plaintiff incurs injury and knows, or reasonably should have known, the cause of such injury.

[A] cause of action for injury to [a] person ... shall be considered to accrue on the date both the injury and its cause are known or should have been known by the exercise of reasonable diligence.

§ 13–80–108(1). Section 13–80–102.5 applies this definition of accrual to medical malpractice actions.[12] Therefore, Garhart's and Tinsman's causes of action accrued on the day Garhart was born, September 4, 1996. The inflationary adjustment only applies to causes of action which accrue on or after January 1, 1998.

Garhart's and Tinsman's argument that they are treated differently from those who suffer injuries as a result of general negligence is unpersuasive. For example, had Garhart's delivery been normal, and Garhart and Tinsman had been injured in a car accident on the way home from the hospital, resulting in noneconomic damages, they could not have been able to claim an inflationary adjustment because their cause of action would have accrued prior to January 1, 1998.

In the context of this case, we therefore decline to reach the issue of whether the exclusion of the HCAA from the 1997 inflationary adjustment legislation violates equal protection. Garhart and Tinsman were treated identically to any other tort plaintiff whose cause of action accrued on September 4, 1996; therefore they failed to show any disparate treatment.

## III.

### Trial Court Rulings

The Hospital challenges a number of trial court rulings. We reject these challenges, except that we order apportionment of Garhart's and Tinsman's noneconomic damages after application of the HCAA damages cap rather than making the apportionment based on the jury's verdict for noneconomic damages and then applying the noneconomic damages cap. We also order periodic payments of Garhart's future damages in accor-

---

12. We recognize that section 13–80–102.5 provides for a longer statute of limitations in which a minor may maintain an action for medical malpractice; however, this does not affect the date of accrual of the action.

dance with our decision in *HealthONE v. Rodriguez,* 50 P.3d 879 (Colo.2002).

## A. Sufficient Evidence of Causation Existed to Support the Judgment in Favor of Garhart and Tinsman

According to the evidence, the fetal monitoring strip data for Garhart indicated that at 11:24 p.m. he suffered a severe deceleration. The jury was entitled to find that Nurse Powell, who was overseeing Garhart's delivery, should have recognized at this point the severe danger to which Garhart was exposed prior to his birth. She could have called Dr. Abarca in; she did not. She could have recognized the advisability of a c-section delivery at this point and called in the doctor for consultation; she did not.

The Hospital argues that none of this would have made any difference; rather, it was Dr. Abarca's decision later to proceed with vaginal delivery that caused both Garhart's and Tinsman's injuries and no evidence exists in the record that Dr. Abarca would have performed a c-section, if Nurse Powell had timely notified her of the dangerous condition shown by the monitoring strip data. Thus, the Hospital ascribes the cause of the full extent of Garhart's and Tinsman's injuries to Dr. Abarca.

At the close of Garhart's and Tinsman's case, the Hospital moved for a directed verdict, asserting that Garhart and Tinsman did not submit any evidence of Hospital actions that caused the injuries to either of them. The court determined that sufficient evidence existed to give the case against the Hospital to the jury. We agree.

When determining a motion for directed verdict, a trial court, as well as an appellate court, must view the evidence in the light most favorable to the nonmoving party. *Bloskas v. Murray,* 646 P.2d 907, 912 (Colo.1982). A court should direct a verdict to the moving party only when the evidence is so strong that reasonable minds could not arrive at a contrary result. *Safeway Stores, Inc. v. Langdon,* 187 Colo. 425, 430, 532 P.2d 337, 340 (1975).

The Hospital now attempts to create an inference that, had Nurse Powell called Dr. Abarca to the delivery room at 11:24 p.m. when the strip data showed the severe deceleration, her actions would have been no different from her actions at 12:45 a.m.

The evidence is sufficient to undercut such an inference. Dr. Abarca testified that, when she was notified of the problems at 12:45 a.m., her decision to proceed with vaginal delivery was because she determined it to be the most expedient method of delivery *at that time.*

Dr. Abarca also testified that she would have liked to have known of the severe deceleration that occurred at 11:24 p.m. When asked how she would have proceeded if she had been notified of that deceleration, Dr. Abarca responded, "Had I been aware of the deceleration at 11:24 and evaluated this patient at that time, and had I not been able to effect improvement of the fetal monitor strip, I would have moved toward a cesarean section delivery."

Although no one knows what would have happened if Nurse Powell had notified Dr. Abarca at 11:24 p.m. of the alarming monitoring strip data, as she should have, the circumstantial evidence supporting proximate cause here sufficiently supported the trial court's decision to submit the matter to the jury. As we said in *City of Longmont v. Swearingen,* 81 Colo. 246, 254 P. 1000 (1927):

> It is urged, however, that there was no evidence that the defendant's negligence was the proximate cause of the death. While it is true that there was no direct evidence that, if a life guard had been present, death would not have resulted, yet we think the facts and circumstances proven were sufficient, together with the inference which may logically be drawn from the evidence, to justify the finding that a failure to have a life guard there was the proximate cause of death.
>
> All that is necessary to warrant the finding of proximate cause is to establish by the evidence such facts and circumstances as would indicate with reasonable probability that the death was caused by drowning, which resulted from the negligence of defendant in not having a life guard present, because from this evidence it may fairly

and logically be inferred that, had a life guard been present, death would not have resulted. *The causal connection may be established by the circumstances. Proximate cause is a question for the jury.*

. . . .

To require direct evidence that, if a life guard had been present, death would not have resulted, would be to exact evidence which it would be impossible to obtain, and would result in a denial of justice.

*Id.* at 250–51, 254 P. at 1002.

Here, Dr. Abarca testified that she could have proceeded with a c-section delivery had she been notified of Garhart's condition at 11:24 p.m. In denying the Hospital's motion, the trial court specifically pointed out Dr. Abarca's testimony. Viewed in the light most favorable to Garhart and Tinsman, sufficient evidence existed as to the Hospital's negligence and its role in causing injuries to both persons.

## B. The Trial Court Did Not Err When It Refused to Instruct the Jury on Doctor/Patient Informed Consent

At the instructions conference, the trial court rejected three jury instructions on informed consent that the Hospital submit-

13. After designating Dr. Volin and Dr. Abarca as responsible nonparties, the Hospital tendered three instructions, which are based on Colorado Civil Jury Instructions 15:10, 15:11, and 15:12:

1. For the plaintiff, Jennifer Tinsman, to recover on a claim of negligence based on lack of informed consent, you must find all of the following have been proved by a preponderance of the evidence:
 a. Monica Abarca, M.D., performed a vaginal delivery of Kody Garhart;
 b. Monica Abarca, M.D., and/or Stephen Volin, M.D., negligently failed to obtain the plaintiff's informed consent before performing a vaginal delivery;
 c. A reasonable person in the same or similar circumstances as the plaintiff would not have consented to a vaginal delivery had she been given the information required for informed consent; and
 d. The nonparties' negligent failure caused the plaintiff injuries, damages or losses.
 If you find that any one or more of these four statements has not been proved, then your verdict on this claim must be for the nonparties. On the other hand, if you find that all

ted.[13] Earlier at trial, the Hospital presented evidence of the doctors' negligence in failing to inform Tinsman of the risks associated with a vaginal delivery. In addition, Tinsman testified that if she had been informed of these risks, she would have insisted on a c-section. In light of this evidence, the Hospital argued that the jury should be instructed that the doctors' negligence in failing to obtain Tinsman's informed consent should be considered in allocating the Hospital's fault and damages.

In this appeal, the Hospital argues that the jurors were not fully instructed on the law applicable to this case because the general negligence instruction did not inform the jurors that Colorado law requires a doctor to obtain a patient's informed consent to perform a proposed medical procedure. Because the jury was not instructed on the law of informed consent, the Hospital asserts that the jury misallocated the degree of fault between the doctors and the Hospital, thereby increasing the damages owed by the Hospital.

In denying the informed consent instructions tendered by the Hospital, the trial court concluded that the general negligence instruction it had agreed to submit encom-

of these four statements have been proved, then your verdict must be for the plaintiff.
2. A physician must obtain the patient's informed consent before operating on the patient.
 For a patient's consent to be an informed consent, a physician must have informed the patient of the following:
 a. The nature of the medical condition;
 b. The nature of the operation;
 c. The alternative treatments available, if any; and
 d. The substantial risks, if any, involved in undergoing the operation and the substantial risks, if any, of the alternative treatments.
 A physician must inform a patient of the above four items to the extent a reasonable physician practicing in the same field of practice as a specialist, at the same time, would have under the same or similar circumstances. The failure to do so is negligence.
3. A substantial risk is one a physician knows or a reasonably careful physician should know would be significant to the patient in deciding whether to submit to a particular operation.

passed the doctors' negligence in failing to obtain informed consent. The court further stated that the informed consent instructions would "simply confuse the jury as drafted." After the trial court's ruling that the informed consent instructions were confusing as drafted, the Hospital made no effort to redraft the tendered instructions. Additionally, the court stated that it would allow the parties to argue the issue of negligence based on lack of informed consent in their closing statements.

 A trial court must properly instruct the jury on the law applicable to the case if there is sufficient evidence in the record to support it. *Gordon v. Benson,* 925 P.2d 775, 777–78 (Colo.1996). However, when a party tenders an instruction in a civil case that incorrectly states the law applicable to that case, the trial court does not err by declining to redraft the instructions to correctly state the law of the case. *See Hansen v. State Farm Mut. Auto. Ins. Co.,* 957 P.2d 1380, 1384–85 (Colo.1998).

 Under Colorado law, a doctor has a duty to obtain a patient's informed consent to perform a proposed medical procedure, which involves informing the patient of any substantial risks of the procedure. *Bloskas v. Murray,* 646 P.2d 907, 912–13 (Colo.1982). Further, this court has held that "a claim for negligence based on lack of informed consent is a separate claim" from a general negligence claim in medical treatment. *Gorab v. Zook,* 943 P.2d 423, 427 (Colo.1997). The Hospital presented sufficient evidence to show that the doctors were negligent in failing to inform Tinsman of the risks associated with a vaginal delivery. Thus, if the Hospital had tendered properly drafted informed consent instructions, the trial court should have instructed the jury on this issue.

 The Hospital failed to tailor its informed consent instructions properly to the facts of this case. The Hospital's first instruction explained that the impact of the jury's finding regarding the informed consent issue would result in a verdict either in favor of the doctors or in favor of Tinsman. In the words of the instruction, if the doctors obtained Tinsman's informed consent for the

vaginal delivery, "then your verdict on this claim should be for the [doctors]"; otherwise, "your verdict must be for the plaintiff." The instruction should have informed the jury that if the doctors failed to obtain Tinsman's informed consent, then it should allocate a greater percentage of fault to the doctors and a lesser percentage to the Hospital, which would have reduced the Hospital's damages. None of the instructions submitted by the Hospital correctly explained how the jury's finding on the informed consent issue should affect the allocation of damages between the parties. In short, the instructions submitted by the Hospital were confusing and erroneous, and the Hospital made no effort to redraft its tendered instructions.

 As written, the informed consent instructions incorrectly stated the law applicable to this case. The trial court may not assume the role of an advocate and bears no responsibility to redraft tendered civil instructions to correct errors in those instructions. *Hansen,* 957 P.2d at 1384–85.

 Although the trial court erred in ruling that the general negligence instruction subsumed the informed consent issue, the court told the Hospital's counsel that he could argue the informed consent issue and its effect on the allocation of damages to the jury. During his closing statement, counsel for the Hospital made only one brief, indirect reference to the doctors' failure to obtain informed consent. He did not attempt to clarify how a lack of informed consent should affect the jury's damages allocation. The trial court did not commit reversible error by refusing to submit the informed consent instructions to the jury because the Hospital did not show that it suffered from a substantial prejudicial error. *Armentrout v. FMC Corp.,* 842 P.2d 175, 186 (Colo.1992).

**C. The Trial Court Did Not Err When It Refused to Instruct the Jury on Second Event Apportionment**

 The Hospital tendered two instructions based on Colorado Civil Jury Instruction 6:9, titled "Damages Caused by Unrelated Second Event," which would have allowed

damages to be apportioned accordingly.[14] The Hospital argues that the trial court committed reversible error in not submitting the instructions because the hypoxia was causally unrelated to the shoulder dystocia. The Hospital asserts that the shoulder dystocia was solely the result of Dr. Abarca's decision to proceed with vaginal birth rather than perform a c-section, and not Nurse Powell's failure to advise the doctor of Garhart's fetal distress.

In response, Garhart and Tinsman argue that the Hospital misconstrues the law on unrelated second events. In determining whether a second event or injury is causally unrelated to a prior one, Garhart and Tinsman assert that a court should focus not on whether the first event was causally related to the second, but instead on whether the defendant's conduct was causally related to both events. In this case, Garhart's claim in negligence attributes both injuries to Nurse Powell's omission—her failure to inform Dr. Abarca of Garhart's fetal distress, which in turn resulted in a c-section not being timely performed. Because Nurse Powell's omis-

sion prolonged Garhart's declining condition in utero and delayed a necessary c-section, Garhart and Tinsman argue that the Hospital's negligence was causally related to both injuries.

In rejecting the Hospital's tendered instructions, the trial court found that Garhart's hypoxia and the shoulder dystocia were causally related when it stated, "[t]he unrebutted evidence in this case is that Kody Garhart's injuries arose from the time that he entered the hospital and arose exclusively as a result of the vaginal birth which occurred in this case." In addition, the trial court concluded that whether the unrelated second event instruction should be submitted to the jury involved "nothing more" than a "causation issue," and that "there is no factual basis for [ ] the instruction."

A trial court must properly instruct the jury on the law applicable to the case if there is sufficient evidence in the record to support it. *Gordon v. Benson*, 925 P.2d 775, 777–78 (Colo.1996). The trial court's evidentiary finding on whether sufficient evidence in the

---

14. The two instructions that the Hospital proposed read as follows:

Proposed Instruction 1:

The plaintiff, Kody Garhart, claims damages from the defendant, North Suburban Medical Center, for injuries caused by an extended lack of oxygen during labor. If you find that the defendant was negligent and that its negligence was a cause of any injuries then the plaintiff may recover all damages caused by the defendant's negligence. But if you find the plaintiff was later injured by acts or failures to act by Dr. Abarca or Dr. Volin, including Dr. Abarca's failure to perform a cesarean section, which were not caused by any acts or omissions of the defendant, North Suburban Medical Center, then the plaintiff may not recover any damages caused only by Dr. Abarca's failure to perform a cesarean section.

However, if you find the failure to perform a cesarean section increased any injuries caused by an earlier extended lack of oxygen then you must separate, if possible, those damages caused by any earlier lack of oxygen from those caused by the failure to perform a cesarean section, and the plaintiffs may recover all those separate damages caused by the earlier lack of oxygen.

If you are unable to separate the damages caused by any earlier lack of oxygen from any damages caused by the subsequent failure to perform a cesarean section, then the plaintiffs may not recover from this defendant.

Proposed Instruction 2:

The plaintiff, Kody Garhart, claims damages from the defendant, North Suburban Medical Center, for injuries caused by an extended lack of oxygen during labor. If you find that the defendant was negligent and that its negligence was a cause of any injuries then the plaintiff may recover all damages caused by the defendant's negligence. But if you find the plaintiff was later injured by the occurrence of shoulder dystocia during delivery, which was not caused by any acts or omissions of the defendant, North Suburban Medical Center, then the plaintiff may not recover any damages caused by the occurrence of shoulder dystocia during delivery.

However, if you find the occurrence of shoulder dystocia increased any injuries caused by an earlier lack of oxygen then you must separate, if possible, those damages caused by any earlier lack of oxygen from those caused by the occurrence of shoulder dystocia, and the plaintiffs may recover all those separate damages caused by the earlier lack of oxygen.

If you are unable to separate the damages caused by any earlier lack of oxygen from any damages caused by the subsequent occurrence of shoulder dystocia, then the plaintiffs may not recover from this defendant.

record existed to support submitting the unrelated second event instruction is subject to an abuse of discretion standard. *See Valdez v. People*, 966 P.2d 587, 598 (Colo.1998) (Kourlis, J., dissenting).

▮ Colorado precedent treats a second event as unrelated to the first if the two are causally unrelated to the defendant's conduct. *See, e.g., Guerrero v. Bailey*, 658 P.2d 278 (Colo.App.1982) (emotional distress from automobile accident aggravated by subsequent job layoff); *Bruckman v. Pena*, 29 Colo.App. 357, 487 P.2d 566 (1971) (two separate collisions occurring eleven months apart). The Civil Jury Instructions define an "unrelated second event" as a "*subsequent* accident or injury which was *not causally related* to the accident involving the defendant." *See* CJI–Civ. 4th 6:9 n. 1 (emphasis added). The example of an unrelated second event in the model instruction is an injury caused by a car accident on one date followed by an injury caused by a toboggan accident several months later. CJI–Civ. 4th 6:9. Accordingly, an injury that is causally related through the defendant's conduct to a prior or concurrent injury is not an unrelated second event and does not warrant an unrelated second event instruction.

In this case, Garhart's negligence claim was based on the Hospital's failure to advise the doctor of his fetal distress, which resulted in the delivery not being performed in a timely manner. Nurse Powell's failure to inform the doctor of Garhart's declining condition in a timely manner resulted not only in the hypoxia, but also contributed to delay leading to performance of a vaginal delivery, causing the shoulder dystocia. The Hospital's negligence was causally related to both the hypoxia and the shoulder dystocia. Thus, the trial court's factual finding regarding the unrelated second event was not an abuse of discretion, and the trial court did not commit reversible error in declining to submit an unrelated second event instruction to the jury.

### D. The Trial Court Did Not Err in Excluding Evidence Regarding the Cost of an Annuity

▮ The Hospital attempted to introduce evidence of an annuity estimate, which is an alternate method of arriving at a present value of future damages. According to the Hospital's annuity evidence, the present value of Garhart's future damages was $1,500,800. According to Garhart, the present value was $10,000,000.

The trial court did not allow the Hospital to present the annuity evidence, finding that it did not account for life expectancy, and the HCAA requires such consideration. Although an annuity does account for life expectancy, and therefore the trial court excluded the evidence on the wrong theory, we uphold the decision to exclude it.

An annuity is an insurance company's estimate of what it will charge to take the risk of making the required payments to support an injured person for the rest of his or her life. The Hospital argues that such evidence "has a hallmark of reliability because the insurance company [is] risking its assets; if [Garhart] lives longer than the company estimate[s], the company could lose a substantial amount of money."

Garhart responds that the Hospital's proffered expert evidence was no more than the testimony of an insurance salesman. An annuity is simply an estimate of what an insurance company thinks it would cost to support a person that particular week. Annuities can change dramatically from week to week and month to month depending on current interest rates. Additionally, other factors such as overhead or profit may not be included in the annuity quote.

We have not had occasion to address the issue of admissibility of annuity evidence; however, we have the opinions of many other states to guide our decision. One of the leading cases on the issue is *Farmers Union Federated Cooperative Shipping Ass'n v. McChesney*, 251 F.2d 441 (8th Cir.1958). There, the Eighth Circuit Court of Appeals discussed the merits of annuity testimony in depth. It held that the cost of an annuity is not an acceptable method of determining present value of future damages. Although the Eighth Circuit's concern appears to center more on the possibility that a plaintiff

may be overcompensated rather than under compensated, the analysis is instructive:

> The cost of an annuity for the remainder of the injured person's life is not the measure of recovery for lost or diminished earning power. The measure is, as we have stated, the gross amount of the lost earnings reduced to their present cash value. Plaintiff's method of proof here sought to hold defendant to the cost of this particular insurance company's annuity, which of course included a profit to the company, whose interest or discount rate was undisclosed and which was based upon a special annuity life expectancy table indicating an increased life expectancy existing solely because of the annuity itself. An additional reason for inadmissibility of the cost of an annuity is the fact that it does not take into consideration that earning capacity, at least to its fullest extent, does not endure to the end of life expectancy but diminishes with age. We conclude that the trial court erred in admitting the evidence as to the cost of an annuity.

*Id.* at 444.

■ ■ We accord a trial court great discretion in determining whether to admit evidence. Unless a trial court's evidentiary ruling is manifestly arbitrary, unreasonable, or unfair, we will not disturb it. *See generally Hock v. New York Life Ins. Co.*, 876 P.2d 1242 (Colo.1994). Although the trial court here based its reasoning on the erroneous conclusion that an annuity does not incorporate life expectancy, this ruling was not arbitrarily unreasonable or unfair. The trial court listened carefully to the Hospital's reasons for wanting to present the testimony concerning the annuity and ultimately deter-

mined that, pursuant to C.R.E. 701, 703, and 403, the evidence was not admissible. We agree with the trial court's ruling. The proffered annuity evidence was speculative in nature and would have had a great tendency to confuse the jury.[15]

### E. The Trial Court Erred in Permitting the Plaintiffs to Recover the Entire Noneconomic Damages Awards from the Hospital Where Two Co-defendants Settled Before Trial and the Jury Attributed a Portion of Fault to the Settling Co-defendants

The Hospital asserts that the trial court applied the HCAA noneconomic damages cap incorrectly. With regard to Garhart's award, the trial court first apportioned sixty percent of the fault to the Hospital and then reduced the award for noneconomic damages to $250,000. The Hospital asserts that the court should first have reduced the award to $250,000 and then apportioned sixty percent of that to the Hospital. Under this analysis, the Hospital would owe only $150,000, rather than the full $250,000.

Likewise for Tinsman, the jury found her total economic damages to be $600,000 with the Hospital responsible for $240,000, forty percent of those damages. The trial court left this award intact since it did not exceed the $250,000 cap. However, the Hospital asserts that the court should first have reduced the $600,000 to $250,000, and then apportioned forty percent of that to the Hospital, leaving the Hospital responsible for only $100,000 rather than $240,000.

The Hospital argues that section 13–64–302(1)(b), 5 C.R.S. (2001), unambiguously

---

**15.** In our holding today, we join several other courts who have determined that evidence of an annuity is not admissible to establish present value of future damages. *Farmers Union Federated Coop. Shipping Ass'n v. McChesney*, 251 F.2d 441, 444 (8th Cir.1958) ("The cost of an annuity for the remainder of the injured person's life is not the measure of recovery for lost or diminished earning power."); *Gusky v. Candler Gen. Hosp., Inc.*, 192 Ga.App. 521, 385 S.E.2d 698, 701 (1989) (Expert testimony regarding annuities is irrelevant as it is antithetical to the requirement that the jury reduce future damages to present value.); *Singh v. Air Ill., Inc.*, 165 Ill. App.3d 923, 117 Ill.Dec. 501, 506, 520 N.E.2d

852, 857 (1988) (recognizing that an annuity is not necessarily representative of the present value of future damages); *Gregory v. Carey*, 246 Kan. 504, 791 P.2d 1329, 1333 (1990) (Annuity testimony from a broker was inadmissible hearsay and thus excluded.); *Bychinski v. Sentry Ins.*, 144 Wis.2d 17, 423 N.W.2d 178, 180 (1988) (Whether to admit testimony regarding an annuity is within the trial court's discretion.); *Herman v. Milwaukee Children's Hosp.*, 121 Wis.2d 531, 361 N.W.2d 297, 306 (1984) ("Admission of an annuity evidence could have misled the jury into believing it must award a lesser sum than the present value of the future losses.").

supports its calculations, stating that the total amount recoverable from "all defendants" cannot exceed $250,000. Section 13–64–302(1)(b) states in pertinent part:

> The total amount recoverable for all damages for a course of care for all defendants in any civil action for damages in tort ... shall not exceed one million dollars, ... of which not more than two hundred fifty thousand dollars ... shall be attributable to noneconomic loss or injury.

*Id.*

 We review questions of statutory interpretation de novo. *Mortgage Invs. Corp. v. Battle Mountain Corp.*, 70 P.3d 1176, 1183 (Colo.2003). In construing a statute, our primary responsibility is to give effect to the General Assembly's intent. *Reg'l Transp. Dist. v. Lopez*, 916 P.2d 1187, 1192 (Colo.1996). To do this, we first look to the language of the statute, if we can clearly discern intent from the language, we need look no further. *Id.* We have previously held that section 13–64–302 is clear and unambiguous on its face. *Preston v. Dupont*, 35 P.3d 433, 438 (Colo.2001); *Colo. Permanente Med. Group, P.C. v. Evans*, 926 P.2d 1218, 1230 (Colo.1996). In *Evans*, we thoroughly discussed section 13–64–302 and held that a personal injury plaintiff is limited to "one total recovery of $250,000 in noneconomic damages." *Evans*, 926 P.2d at 1230.

> Unlike the general damages statute [section 13–21–102.5], section 13–64–302 is not ambiguous on its face. While [the plaintiff] may be correct in her assertion that section 13–64–302 was passed in the same tort reform spirit as the general damages statute and contains a similar cap on noneconomic damages, this in no way diminishes the fact that the language of the two statutes is significantly different. Section

13–64–302 unequivocally states that the "total amount recoverable for a course of care for all defendants" attributable to noneconomic damages shall not exceed $250,000.

*Id.* This passage in *Evans* specifically distinguished the HCAA damage cap from the general tort damage cap provided in section 13–21–102.5.[16] We agree with the Hospital's assertion that the HCAA statute allows for a total recovery of $250,000 against all defendants, rather than against each defendant.

 The question is, are the designated non-party tortfeasors, Dr. Volin and Dr. Abarca, considered to be "defendants" for the purposes of the statute, as the statute clearly limits the amount recoverable for "all defendants" to $250,000? The language and context of the HCAA supports our conclusion that section 13–64–302 applies to all the named negligent defendants and designated non-party tortfeasors the jury finds to have been negligent and responsible for damages. Dr. Volin and Dr. Abarca were named defendants in this action and reached a settlement with Garhart and Tinsman before trial. Section 13–64–302 does not apply solely to the defendants who remain for trial.

We conclude that Dr. Volin and Dr. Abarca are "defendants" in this action for purposes of the noneconomic damages cap. The trial court should have first applied the HCAA cap to the jury's noneconomic damages award, then apportioned that amount according to the percentages the jury found to exist for each tortfeasor.

 The Hospital also asserts that the district court applied the HCAA economic damages cap incorrectly. We agree, as with the noneconomic damages cap, the $1,000,000 economic damages cap should be applied to a

---

**16.** In addition to our holding in *Evans*, the General Assembly has also expressed an intent that we construe the HCAA provisions independently of the general damage provisions. In the hearings on H.B. 03–1007, which addressed whether damages for disfigurement are included in noneconomic damages for purposes of the HCAA cap, Representative Williams, the bill's sponsor, clarified that the HCAA is independent from the general damage caps.

The committee report clarifies the legislative declaration.... The legislative declaration in

the bill as introduced in committee was not specific enough, and so we added another paragraph ... which makes it clear that when we talk about liability in the medical malpractice arena, we are always talking about C.R.S. 13–64–302.

*Concerning the Limitation on Noneconomic Damages for Certain Physical Injuries in Medical Malpractice Claims: Hearing on H.B. 1007 before House on Second Reading*, 64th Gen. Assem., 1st Reg. Sess. (Colo.2003).

jury award before apportionment of the award pursuant to the jury's allocation of fault. In accordance with section 13-64-302(1)(b), this applies only to economic damages that the district judge has not, or cannot, exempt from the economic damages cap.[17] We return this case to the district court with instructions to revise the economic and noneconomic damages awards for both plaintiffs accordingly.

## F. Payment of Future Damages Should Be in the Form of Periodic Payments Rather than Lump Sum

 Relying on the court of appeals decision in *Rodriguez v. HealthONE*, 24 P.3d 9 (Colo.App.2000), which held the provisions of the HCAA mandating periodic payments of an award for people under the age of twenty-one and incapacitated adults unconstitutional, the trial court ordered Garhart's future damages paid in one lump sum. Subsequent to the trial court's order, we reversed the court of appeals and held that the provisions mandating periodic payments were rationally related to a legitimate governmental purpose and therefore constitutional. *HealthONE v. Rodriguez*, 50 P.3d 879 (Colo.2002). The Hospital asserts that the judgment must be reversed and remanded, with instructions for payment of future damages in the form of periodic payments rather than a lump sum. We agree.

Sections 13–64–205(1)(e) and (f) allow only certain personal injury plaintiffs to receive a future damages award in a lump sum.

(1) In order to determine what judgment is to be entered on a verdict requiring findings of special damages under this part 2, the court shall proceed as follows:

. . .

(e) Upon petition of a party before entry of judgment and a finding of incapacity to fund the periodic payments, the court, at the election of the claimant . . . shall enter a judgment for the present value of the periodic payments.

(f) Within no more than three months after the entry of verdict by the trier of fact and before the court enters judgment for periodic payments, the plaintiff who meets the criteria set forth in this subsection (1) may elect to receive the immediate payment to the plaintiff of the present value of the future damage award in a lump-sum amount in lieu of periodic payments. In order to exercise this right, the plaintiff must:

(I) Have reached his twenty-first birthday by the time the periodic payment order is entered;

(II) Not be an incapacitated person, as defined in section 15–14–102(5), C.R.S.; and

(III) Have been provided financial counseling and must be making an informed decision.

§ 13–64–205(1), 5 C.R.S. (2003). In our holding in *Rodriguez,* the "incapacitated person" clause withstood an equal protection challenge. *See generally HealthONE v. Rodriguez*, 50 P.3d 879 (Colo.2002). Therefore, in order to exercise the right to receive future damages payments in one lump sum, the claimant must: (1) be twenty-one years of age; (2) not be incapacitated; and (3) have received financial counseling. Garhart does not meet these criteria.

Further, section 13–64–203 addresses periodic payments in detail:

(1) In any civil action for damages in tort brought against a health care professional or a health care institution, the trial judge *shall* enter a judgment ordering that awards for future damages be paid by periodic payments rather than by a lump-sum payment if the award for future damages exceeds the present value of one hundred fifty thousand dollars, as determined by the court.

Of Garhart's total economic damages award, the district judge exempted the maximum amount possible, $6,300,000, leaving $1,095,000 subject to the economic damages cap. Of Tinsman's total economic damages award, the district judge opted not to exempt any amoung, leaving the entire 1,185,000 subject to the cap.

---

**17.** Pursuant to section 13-64-302(1)(b), a district judge, after considering the factors outlined in the statute, may "award the present value of additional future damages only for loss of such excess future earnings, or such future medical and other health care costs, or both," thus exempting these amounts from the $1,000,000 cap.

(2) In any such action in which the award for future damages is one hundred fifty thousand dollars or less, present value, the trial judge *may* order that awards for future damages be paid by periodic payments.

§ 13–64–203, 5 C.R.S. (2003) (emphasis added). This statute demonstrates that when an award for future damages is greater than $150,000, the trial judge has no discretion to award payment in a lump sum.

In *Rodriguez,* we held that the statute requiring periodic payments for injured plaintiffs such as Garhart is not unconstitutional. Therefore, we reverse the trial court and remand the judgment for payment of future damages in the form of periodic payments.

### IV.

Accordingly, we affirm in part and reverse in part the trial court's judgment. The trial court erred in determining the periodic payment provision of the HCAA unconstitutional. The trial court must order periodic payments of Garhart's future damages. In addition, the trial court must also calculate Garhart's and Tinsman's noneconomic damages and economic damages that the judge has not, or cannot, exempt from the economic damages cap awards by first applying the HCAA damages caps and then apportioning the award pursuant to the jury's percentages. In all other respects we affirm the trial court's judgment. We return this case to the trial court for further proceedings consistent with this opinion.