Debra DILLARD, Petitioner,

v.

INDUSTRIAL CLAIM APPEALS OF-
FICE OF the STATE OF COLORADO
and Pepsi Bottling Group, Respondents.

No. 05SC494.

Supreme Court of Colorado,
En Banc.

May 15, 2006.

Killian, Guthro & Jensen, P.C., Joanna C. Jensen, Damon Davis, Barbara R. Butler, Grand Junction, for Petitioner.

Gregory B. Cairns, Denver, for Respondent Pepsi Bottling Group.

John W. Suthers, Attorney General, Eric S. Rothaus, Assistant Attorney General, State Services Section, Denver, for Respondent Industrial Claim Appeals Office of Colorado.

Law Office of O'Toole & Sbarbaro, P.C., Neil D. O'Toole, Denver, The Frickey Law Firm, Janet Frickey, Lakewood, for Amicus Curiae Workers Compensation Education Authority.

McElroy, Deutsch, Mulvaney & Carpenter, LLP, Thomas L. Kanan, Alice Q. Hosley, Denver, for Amicus Curiae Colorado Civil Justice League.

Clisham, Satriana & Biscan, L.L.C., Patricia Jean Clisham, Keith E. Mottram, Denver, for Amicus Curiae Colorado Self Insurer's Association.

Chief Justice MULLARKEY dissents, and Justice MARTINEZ joins in the dissent.

Justice EID does not participate.

HOBBS, Justice.

We granted certiorari to review the court of appeals decision in *Dillard v. Industrial Claim Appeals Office*, 121 P.3d 301 (Colo. App.2005).[1] The issue in this case is whether a claimant may combine a mental impairment rating with a physical impairment rating for the purpose of exceeding the then-applicable sixty thousand dollar cap in favor of the one hundred twenty thousand dollar cap, both of which are contained in section 8–42–107.5, C.R.S. (2005), of Colorado's Workers' Compensation Act.[2] This section caps benefits from combined temporary disability payments and permanent partial disability payments. No claimant whose impairment rating is twenty-five percent or less may receive more than sixty thousand dollars from combined temporary disability payments and permanent partial disability payments; those claimants who have an impairment rating above twenty-five percent receive the benefit of the higher cap.

In the case before us, the division-sponsored medical examination (DIME) physician rated claimant's whole person impairment at a total of 29%: 23% for the claimant's cervical spine, 2% for the left hip, and 5% for mental impairment.

The 5% mental impairment rating, when combined with the physical impairments ratings and converted to a whole person rating, produced a DIME rating of 29%, pushing Dillard's impairment rating above 25%. She therefore asserts entitlement to the higher cap contained in section 8–42–107.5. We disagree. Along with the administrative law judge, a panel of the Industrial Claim Appeals Office, and the court of appeals, we hold that section 8–42–107(7)(b)(III), C.R.S. (2005), precludes combining a mental impairment rating with a physical impairment rating for the purpose of obtaining the benefit of the higher cap set forth in section 8–42–107.5.

Accordingly, we uphold the judgment of the court of appeals.

---

1. We granted certiorari on the following issue: Whether the court of appeals erred in applying section 8–42–107.5, C.R.S., which is a section of the workers' compensation act which applies to the total amount of compensation that is available to injured workers based upon the severity of their injuries, by using section 8–42–107(7)(b)(I) and (III), C.R.S., which is the section of the act that determines the type of impairment or methodology of computing pay-

ment for impairment, to deprive or further limit injured workers' permanent disability benefits.
(Emphasis in original).

2. Effective January 1, 2006, the General Assembly revised section 8–42–107.5 to increase these respective caps to seventy-five thousand dollars and one hundred fifty thousand dollars.

## I.

In 1999, Debra Dillard ("Dillard") worked as an administrative assistant for Pepsi Bottling Group ("Pepsi"), in Grand Junction, Colorado. On December 19 of that year, she slipped on ice in front of her workplace and hit her head on the sidewalk.

Dillard immediately complained of pain in her head and cervical region. She proceeded directly to the emergency room via an ambulance. At the hospital, doctors diagnosed her with scalp hematoma and a closed head injury.

Several days later, pain and stiffness in Dillard's neck became unbearable and she again sought medical advice. An MRI uncovered damage to one and possibly two discs in Dillard's cervical spine. After conservative treatments failed, doctors removed her C4–C5 disc and fused bones in her cervical spine together with plates and screws. When Dillard's pain did not adequately subside, doctors repeated the operation for her C6–C7 disc.

Throughout this time, Dillard was prescribed Serzone for depression and Xanax for anxiety and complained that she could not sleep and often cried throughout the night. She blamed her emotional distress upon her physical inability to engage in many everyday (as well as recreational) activities, intense and constant pain, as well as a perceived threat to her marriage and family. However, Dillard did not initially claim disability benefits for mental impairment.

When Dillard reached maximum medical improvement, her attending physician determined that her total body permanent impairment rating was 20% of the whole person. He did not take into account Dillard's anxiety and depression. Dillard received an independent medical examination. The independent medical examiner determined that Dillard's whole person impairment rating was 29%, upon combining the impairment for Dillard's depression and anxiety with her physical impairments.

Whether or not Dillard's impairment rating should include the mental impairment rating as well as the physical impairment rating for purposes of the section 8–42–107.5 cap is the subject of this dispute. An impairment rating above 25% would entitle her to have the benefit of the higher cap for temporary disability and permanent partial disability payments under section 8–42–107.5.

According to the record, Dillard received $51,569.33 in temporary disability benefits and, in gross, is entitled to $79,969.89 in permanent partial disability benefits. Therefore, under the $60,000 cap, Dillard received $8,430.67 in permanent partial disability benefits. If she qualifies for the $120,000 cap she could receive substantially more.

## II.

We hold that section 8–42–107(7)(b)(III), C.R.S. (2005), precludes combining a mental impairment rating with a physical impairment rating for the purpose of obtaining the benefit of the higher cap set forth in section 8–42–107.5, C.R.S. (2005).

### A.

### Standard of Review

■ This case concerns the correct construction of sections 8–42–107(7)(b)(III) and 8–42–107.5, C.R.S. (2005). We review questions of statutory construction de novo. *People v. Cross*, 127 P.3d 71, 73 (Colo.2006).

■ In construing the Workers' Compensation Act, our objective is to effectuate the intent of the General Assembly; we construe the statutory provisions as a whole, reconciling potential conflicting provisions, when possible. *Lobato v. Indus. Claim Appeals Office*, 105 P.3d 220, 223 (Colo.2005); *see also Resolution Trust Corp. v. Heiserman*, 898 P.2d 1049, 1054 (Colo.1995) ("[I]f courts can give effect to the ordinary meaning of the words adopted by a legislative body, the statute should be construed as written since it may be presumed that the General Assembly meant what it clearly said.").

■ When we construe a statute, we do not adopt a construction that renders words superfluous, or injects additional terms, that contravene the legislature's obvious intent. *Cross*, 127 P.3d at 73.

## B.

### Mental Impairment Claims and Statutory Caps

The issue in this case concerns temporary disability and permanent partial disability benefits under Colorado's Workers' Compensation Act.[3] Temporary disability benefits compensate a worker for lost work while she recovers from work-related injuries. A worker receives temporary benefits until, among other possibilities, she reaches maximum medical improvement.[4] §§ 8–42–105, –106, C.R.S. (2005) (describing temporary total and temporary partial disability benefits).

Some workers never fully recover from their injuries. In such cases, when a worker reaches maximum medical improvement but still remains permanently disabled, she then receives permanent disability benefits. *See* §§ 8–42–107, –111 (describing permanent partial and permanent total disability benefits).

If a worker is only partially disabled on a permanent basis, the amount of time for which she is eligible to receive benefits is calculated differently based upon the type of injury she sustained: a scheduled injury, a nonscheduled injury, or a mental impairment. *See* § 8–42–107(1)(b)(2), (7)(b)(I), (8).

Scheduled injuries are generally injuries to limbs, eyes, or ears. *See* § 8–42–107(1)(b)(2) (listing scheduled injuries and compensation). They are referred to as "scheduled" injuries because they are compensated according to a

strict schedule contained in the statute; for example, the loss of a hand below the wrist entitles a worker to 104 weeks of permanent partial disability payments. § 8–42–107(2)(c).

A nonscheduled injury is an injury not listed on the schedule in section 8–42–107(2). *See* 8–42–107(8) (describing nonscheduled injuries and their compensation). Permanent partial disability benefits for nonscheduled injuries are calculated according to a formula that includes a worker's "medical impairment rating" and her "age factor." § 8–42–107(8)(d).

Claims for mental impairment[5] are defined in section 8–41–301(2)(a), C.R.S. (2005). Mental impairments involve no physical injury and stem from psychologically traumatic workplace events, not including stress or trauma from demotion, promotion, termination and other similar actions undertaken by an employer in good faith. *Id.* Mental impairments may also arise when a worker suffers a disability arising from an accidental physical injury that leads to a recognized permanent psychological disability. § 8–41–301(2)(a.5). Section 8–41–301(2)(d) provides that the mental impairment which is the basis of the claim must be, "in and of itself, either sufficient to render the employee temporarily or permanently disabled from pursuing the occupation from which the claim arose or to require medical or psychological treatment."

---

**3.** This dispute does not concern an employer's obligation to pay medical bills under the Workers' Compensation Act of Colorado. *See Grover v. Indus. Comm'n of Colo.*, 759 P.2d 705, 709–12 (Colo.1988) (stating that medical benefits are separate from disability benefits and may be awarded concurrently); *see also* § 8–42–101, C.R.S. (2005) (describing employer's obligation to furnish medical aid).

**4.** According to section 8–40–201(11.5), C.R.S. (2005):

"Maximum medical improvement" means a point in time when any medically determinable physical or mental impairment as a result of injury has become stable and when no further treatment is reasonably expected to improve the condition. The requirement for future medical maintenance which will not significantly improve the condition or the possibility

of improvement or deterioration resulting from the passage of time shall not affect a finding of maximum medical improvement. The possibility of improvement or deterioration resulting from the passage of time alone shall not affect a finding of maximum medical improvement.

**5.** In terms of Colorado's Workers' Compensation system, mental impairment benefits are rather new. Colorado's General Assembly passed Colorado's first Workers' Compensation Act in 1915. *See Martin v. Montezuma–Cortez Sch. Dist. RE–1*, 841 P.2d 237, 242 (Colo.1992). The General Assembly did not add claims for "mental or emotional stress" and related injuries until 1986. *See* ch. 73, sec. 3, § 8–52–102, 1986 Colo. Sess. Laws 520, 520–21. For a comprehensive history of mental impairment claims nationwide, see 3 Arthur Larson & Lex K. Larson, *Larson's Workers' Compensation Law* § 56.03 to 56.04 (2005).

Permanent partial disability benefits awarded for mental impairment are also limited: a worker is compensated for mental impairment with permanent partial disability benefits for no more than twelve weeks unless she is the victim of a violent crime at work or suffers from a "physical injury or occupational disease that causes neurological brain damage." § 8–41–301(2)(b). Temporary disability benefits awarded for mental impairment are not cut off after twelve weeks but act as a set-off against permanent partial disability benefits once a worker reaches maximum medical improvement. *City of Thornton v. Replogle*, 888 P.2d 782, 785 (Colo.1995); Douglas R. Phillips & Susan D. Phillips, *Colorado Workers' Compensation Practice & Procedure* § 3.12 (2005).

It often arises, as in the case before us, that a worker will sustain more than one type of injury. Prior to 1999, the act allowed workers who suffered both scheduled and nonscheduled injuries to combine their scheduled and nonscheduled injuries into one formula award. *Mountain City Meat Co. v. Oqueda*, 919 P.2d 246, 253 (Colo.1996).

Added in 1999, subsections 8–42–107(7)(b)(I) to (III), C.R.S. (2005), ended this system and mandated in the calculation of permanent partial disability benefit compensation that each type of injury shall remain separate and be compensated solely on the basis of applicable statutory schedule or benefit formula. The General Assembly added to the statute in this 1999 amendment a legislative declaration and the provision we construe in the case now before us, which (1) provides for mental and emotional distress to be compensated under a different provision of the act and (2) prohibits such impairments from being combined with a scheduled or a nonscheduled injury. Ch. 103, sec. 1, § 8–42–107, 1999 Colo. Sess. Laws 298, 299.

These amendments to the permanent partial disability provisions of the statute respond to our *Mountain City Meat* decision. In that judgment, we held that "the scheduled injury must be converted to a whole person impairment rating and combined with the non-scheduled injury's whole person impairment rating in calculating permanent dis-

ability benefits." *Mountain City Meat*, 919 P.2d at 254.

As the General Assembly has the prerogative of doing, in reaction to *Mountain City Meat*, it precluded through its 1999 amendment combining mental impairments with physical impairments to reach a whole person rating. Subsection 8–42–107(7)(b)(I) sets out the legislative declaration of policy. It states that "scheduled injuries shall be compensated as provided on the schedule and nonscheduled injuries shall be compensated as medical impairment benefits." *Id.*

Subsection 8–42–107(7)(b)(II) separates the calculation of disability benefits for scheduled and non-scheduled injuries:

> Where an injury causes a [scheduled injury], the loss set forth in the schedule found in said subsection (2) shall be compensated solely on the basis of such schedule and the loss set forth in said subsection (8) [the nonscheduled injury] shall be compensated solely on the basis for such medical impairment benefits specified in said subsection (8).

In regard to mental impairment claims, subsection 8–42–107(7)(b)(III) provides that "mental or emotional stress shall be compensated pursuant to section 8–41–301(2) and *shall not be combined with a scheduled or a nonscheduled injury.*" (Emphasis added).

Section 8–42–107.5, C.R.S. (2005), adopted in 1991, places a cap upon the total amount of temporary and permanent partial disability benefits that a worker may receive from all of her injuries. *See* ch. 219, sec. 16, § 8–42–107.5, 1991 Colo. Sess. Laws 1291, 1311. The version of section 8–42–107.5 in effect at the time Dillard suffered her injury caps total temporary and permanent partial disability benefits at either $60,000 or $120,000 based upon the worker's impairment rating:

> No claimant whose impairment rating is twenty-five percent or less may receive more than sixty thousand dollars from combined temporary disability payments and permanent partial disability payments. No claimant whose impairment rating is greater than twenty-five percent may receive more than one hundred twenty thousand dollars from combined temporary dis-

ability payments and permanent partial disability payments.[6]

Impairment ratings are calculated by reference to the American Medical Association's *Guides to the Evaluation of Permanent Impairment ("AMA Guides")*, (3d ed. rev. 1990). *See* § 8–42–101(3.7), C.R.S. (2005) ("[A]ll physical impairment ratings used under Articles 40 to 47 of this title shall be based on the revised third edition" of the *AMA Guides*); § 8–42–107(8)(b.5)(I)(A), (8)(c), C.R.S. (2005) (describing calculation of medical impairment ratings). We conclude that the wording of the 1999 amendment operates to prevent combining the mental impairment rating with a physical impairment rating into a whole person rating in order to reach the higher cap level contained in section 8–42–107.5.

### C.

### Application to This Case

■ Comparing the wording of the provisions at issue in this case and giving each of them meaning in relationship to each other, we find that section 8–42–107(7)(b)(III), C.R.S. (2005), unambiguously bars a claimant from combining mental impairments with scheduled or nonscheduled injuries for the purpose of reaching the higher cap contained in section 8–42–107.5, C.R.S. (2005).

According to section 8–42–107(7)(b)(III), not only are mental impairments always compensated according to section 8–42–301(2), the legislature also clearly specified that "[m]ental or emotional stress . . . shall not be combined with a scheduled or a nonscheduled injury." - This second phrase of 8–42–107(7)(b)(III) is the key to our analysis because Dillard would have us rule that it merely reiterates the phrase before it: "Mental or emotional stress shall be compensated pursuant to section 8–42–301(2)."

However, the "shall not be combined" language is unique to section 8–42–107(7)(b)(III). The preceding subsection, section 8–42–107(7)(b)(II), contains nothing

like it to prevent combining scheduled and nonscheduled injuries into a whole person impairment rating for the purposes of section 8–42–107.5. Thus, the mental impairment language, "shall not be combined with a scheduled or a nonscheduled injury," must have meaning. That meaning, when applied to section 8–42–107.5, is that mental impairments are not to be combined with scheduled or nonscheduled injuries when calculating the applicability of the higher cap contained in section 8–42–107.5.

Our *Mountain City Meat* decision construed the then-applicable provisions of the act as awarding compensation based on combining injuries into a whole person rating in calculating permanent disability benefits. The General Assembly's 1999 amendment provided for awards based on separate calculations for scheduled and nonscheduled injuries and mental impairments. In addition, it singled out a prohibition on mental impairments being combined with physical injuries.

Dillard's case for the higher benefit cap rests on combining her mental impairment with physical impairments into a whole person rating, which is what the DIME physician in this case did. Contrary to Dillard's contention, the legislature's treatment of permanent partial disability mental impairment claims is plain. The words "shall not be combined with a scheduled or a nonscheduled injury" in section 8–42–107(7)(b)(III) mean literally what they say.

In regard to mental impairment claims, the *AMA Guides* support the legislature's intent to prevent the combination of mental impairment with physical impairment in assigning a whole person rating. According to the *AMA Guides,* an "impairment rating" roughly represents in percentage form the extent to which a person's health status is altered by injury. American Medical Association, *supra* at 1. Generally, physicians combine all types of injuries into a "whole person" assessment. *Id.* at xviii (emphasis added). The *AMA Guides* even contain charts for the combination of different types of injuries. *Id.* at 254–

---

6. Prior to reaching maximum medical improvement, a worker's benefits are not cut-off. *Donald P. Murphy Contractors, Inc. v. Indus. Claim Appeals Office*, 916 P.2d 611, 613 (Colo.App. 1995). However, workers who receive either up to or in excess of their allotted cap in temporary disability benefits receive no permanent partial disability benefits. *Id.* at 614.

56. However, mental impairments are not included in these charts. The *AMA Guides* clearly state in regard to mental impairments that "there is no available empirical evidence to support any method for assigning percentage of impairment of the whole person . . . ." *Id.* at 240. The *AMA Guides* clearly explain:

> Eventually research may support the direct link between medical findings and percentage of mental impairment. Until that time the medical profession must refine its concepts of mental impairment, improve its ability to measure limitations, and continue to make clinical judgments.

*Id.* at 241.

Dillard's assertion of her entitlement to the higher cap contained in section 8–42–107.5 rests on the assertion that the General Assembly intended for mental impairments to be combined with physical impairments in calculating a whole person rating. We conclude that the General Assembly clearly intended otherwise. It prevented combining mental impairment injuries with scheduled and nonscheduled injuries to reach a whole person rating. The DIME physician in Dillard's case contravened the legislature's intent in calculating a 29% whole person rating for her. § 8–42–107(7)(b)(III).

### D.

### Equal Protection Challenge

■ The court of appeals disagreed with Dillard's alternate contention that sections 8–42–107.5 and 8–42–107(7)(b)(III), so construed, violate Colorado and federal equal protection guarantees. *See Dillard,* 121 P.3d at 305–06. We agree with the court of appeals that no equal protection violation arises therefrom.

■ Access to Workers' Compensation benefits is not a fundamental right and Dillard does not contend that she is a member of a suspect class. We therefore apply a rational basis analysis to Dillard's equal protection claim. *Garhart v. Columbia/Healthone, L.L.C.,* 95 P.3d 571, 583 (Colo.2004); *Culver v. Ace Elec.,* 971 P.2d 641, 646 (Colo. 1999).

■ Under the rational basis test, the party asserting the statute's unconstitutionality must show that the classification lacks a legitimate governmental purpose and, without a rational basis, arbitrarily singles out a group of persons for disparate treatment in comparison to other persons who are similarly situated. *Garhart,* 95 P.3d at 583 (citing *Culver,* 971 P.2d at 646); *accord Pace Membership Warehouse v. Axelson,* 938 P.2d 504, 506 (Colo.1997). If any conceivable set of facts would lead to the conclusion that a classification serves a legitimate purpose, a court must assume those facts exist. *Christie v. Coors Transp. Co.,* 933 P.2d 1330, 1333 (Colo.1997); *Culver,* 971 P.2d at 651.

The rational basis for section 8–42–107(7)(b)(III) and section 8–42–107.5 is to lower costs in the Workers' Compensation system. This can be a legitimate governmental purpose. *Culver,* 971 P.2d at 652 (listing "maintaining the fiscal integrity of the workers' compensation system; allocating the fiscal burden equitably among funding sources, and controlling costs to employers while providing legislatively-intended benefits to injured workers" as possible legitimate government purposes). Nevertheless, the General Assembly cannot arbitrarily single out certain individuals for disparate treatment for the mere sake of administrative convenience or sacrifice the rights of one group merely because more money in the Workers' Compensation system allows higher benefits for everybody else. *Indus. Claim Appeals Office v. Romero,* 912 P.2d 62, 68, 69 (Colo.1996).

The General Assembly's treatment of mental impairment claims demonstrates a rational approach to circumscribing the conditions and amounts payable for such claims. We have previously held that the statutory scheme limits only permanent partial disability benefits paid for mental impairment to twelve weeks, and offsets any temporary disability benefits paid for mental impairment against any award of permanent partial disability benefits for mental impairment. *Replogle,* 888 P.2d at 782–83.

In our *Replogle* opinion we observed that the General Assembly's choice of mental impairment provisions was aimed at containing

costs while, at the same time, awarding mental impairment benefits to qualified claimants. *Id.* at 785. Dillard's equal protection appeal assumes that because the legislature allows a claimant to combine scheduled and nonscheduled physical impairments for purposes of determining the impairment rating in section 8–42–107.5, it must allow the combination of mental with physical impairments in the same cap calculation. However, the legislature can rationally take into account that mental or emotional distress claims are not as susceptible to numerical analysis as physical injuries.

Our appellate court decisions recognize that mental impairments can be difficult to ascertain. *See Davison v. Indus. Claim Appeals Office,* 84 P.3d 1023, 1032 (Colo.2004) (observing that the General Assembly intended mental impairment provisions of the Workers' Compensation Act to help in eliminating frivolous claims while acting to evaluate and pay bona fide claims); *Colo. AFL–CIO v. Donlon,* 914 P.2d 396, 403 (Colo.App. 1995) (stating that General Assembly rationally promotes cost efficiency in Workers' Compensation system by circumscribing compensation for injuries that are neither physical nor the result of workplace violence). Given their more imprecise nature, the General Assembly can rationally create a system for mental impairment claims when it seeks to contain costs by limiting the extent to which mental impairment injuries can increase a worker's benefits.

In view of the General Assembly's rationally-based choice in addressing mental impairment claims, we hold that Dillard's equal protection violation claim does not succeed. The legislature's line drawing need not be perfect. *See, e.g., Pace Membership Warehouse,* 938 P.2d at 507 ("Simply because a statutory classification creates a harsh result in one instance does not mean that the statute fails to meet constitutionality requirements under the rational basis standard."); *Duran v. Indus. Claim Appeals Office,* 883 P.2d 477, 484 (Colo.1994) ("Given the almost limitless array of potential injuries and their impact on the ability to work, any line drawn by the legislature will necessarily be imperfect.").

## III.

Accordingly, we affirm the judgment of the court of appeals.

MULLARKEY, C.J., dissents, and MARTINEZ, J., joins in the dissent.

Chief Justice MULLARKEY, dissenting.

I respectfully dissent from the majority's opinion holding that the 1999 amendments to the permanent partial disability provision of the workers' compensation statute, subsections 8–42–107(7)(b)(I), (II) and (III), C.R.S. (2005), prohibit a physician from including a claimant's mental disability in the claimant's impairment rating for purposes of the cap on benefits imposed by section 8–42–107.5, C.R.S. (2005). For purposes of this dissent, I will refer to the first statute as "the 1999 amendments" and the second statute as "the benefits cap" provision.

Nothing in the express language, legislative history, or surrounding circumstances of either statute requires the result reached by the majority. Accordingly, I would hold that benefits caps must be calculated on the basis of all benefits received by a claimant regardless of the physical or mental character of the claimant's injuries.

## FACTS

Petitioner Debra Dillard suffered serious injuries to her head, cervical spine, and hip when she fell at work. During her recovery from the accident, she was unable to work and received temporary total disability benefits. After she reached maximum medical improvement, she was found to have a permanent partial disability. This case arises because the total amount of money Dillard may receive for both temporary and permanent benefits is limited by a statutory cap based on her impairment rating.

After conducting an independent medical examination, a physician determined that Dillard's impairment rating was 29%. The doctor assigned a 23% whole person impairment rating for her cervical spine injury, 2% for her hip injury, and 5% for her mental impairment. The percentages assigned to her hip

and mental injuries reflect the doctor's conversion of those injuries to a whole person impairment rating; no such conversion was required for the spinal injury. Specifically, the 5% impairment rating was calculated using the Colorado Department of Labor and Employment Permanent Work–Related Mental Impairment Rating Work Sheet that directs physicians to determine a claimant's mental impairment per the American Medical Association's *Guides to the Evaluation of Permanent Impairment* 254–56 (3d ed. Rev. 1990) ("AMA Guides"), and convert the rating according to a table contained in the worksheet where he arrived at the 5% figure. *See* Rule 12–5, 7 C.C.R. 1101–3 (2005); § 8–42–101(3)(a)(I), C.R.S. (2005) (explaining the director's role to review impairment rating guidelines based on both the AMA Guides and promulgated department rules).

The doctor then "combined" the three percentages using the Combined Values Chart from the AMA Guides to arrive at a figure of 29% that was used to determine the applicable benefits cap. It is important to recognize that the word "combine" has a technical meaning when used in connection with the AMA Guides; it does not mean the simple arithmetic addition of the percentages. If it were, the physician would have fixed Dillard's impairment rating at 30% rather than 29%.

Dillard's total award for both temporary and permanent benefits is approximately $131,500. With her 29% rating, Dillard's total benefits are capped at $120,000. Under the majority opinion, her rating falls to 25% and her benefits are capped at $60,000.

### ANALYSIS

The majority contends that the 1999 amendments are unambiguous and compel the conclusion that mental injuries must be excluded from the calculation of the applicable benefits cap. Maj. op. at 411–412. As my discussion above of the word "combine" illustrates, the language is far from unambiguous. The 1999 amendments provide in relevant part:

> (I) .... scheduled injuries shall be compensated as provided on the schedule and nonscheduled injuries shall be compensated as medical impairment benefits, and that, when an injured worker sustains both scheduled and nonscheduled injuries, the losses shall be compensated on the schedule for scheduled injuries and the nonscheduled injuries shall be compensated as medical impairment benefits. The general assembly further determines and declares that mental or emotional stress shall be compensated pursuant to section 8–41–301(2) and shall not be combined with a scheduled or a nonscheduled injury....
>
> (III) Mental or emotional stress shall be compensated pursuant to 8–41–301(2) and shall not be combined with a scheduled or nonscheduled injury.

§ 8–42–107(7)(b)(I), (III). The benefits cap provision states:

> [n]o claimant whose impairment rating is twenty-five percent or less may receive more than sixty thousand dollars from combined temporary disability payments and permanent partial disability payments. No claimant whose impairment rating is greater than twenty-five percent may receive more than one hundred twenty thousand dollars from combined temporary disability payments and permanent partial disability payments.

§ 8–42–107.5.

The starting point for analyzing any statute is the text of the statute itself. To address the majority's contention that the 1999 amendments control the calculation of the benefits cap, I first look to the language of the two statutes. The language quoted above shows that neither statute references the other. As the later-enacted statute, the 1999 amendments would be the logical place for the General Assembly to insert language applying the strictures of the 1999 amendments to the benefits cap, but it did not do so. Recognizing that the express language of the statutes does not resolve the relationship between the two acts, I must turn to other aids to construe the statutes.

The 1999 amendments were enacted in House Bill 99–1157, entitled "An act concerning the reestablishment of an exclusive schedule for permanent partial disability under the workers' compensation law, and in

connection therewith increasing the amount of benefits received under the schedule and limiting benefits for mental stress." H.B. 99–1157, Ch. 103, sec. 1, § 8–42–107, 1999 Sess. Laws 298, 299. It amended the permanent partial disabilities section by adding subsections 8–42–107(7)(b)(I), (II), and (III) to provide that each type of injury, both physical and mental, is to be compensated separately. *See id.* House Bill 99–1157 did not address temporary disability benefits, and did not amend the benefits cap limiting the amount of money any claimant can receive for temporary and permanent benefits related to the same accident. As noted above, the bill had a narrow title and was limited to permanent partial disability awards. These facts indicate that the legislature did not intend the 1999 amendments to apply to the benefits cap provision.

Mental impairment is compensated separately from both scheduled and nonscheduled physical injuries. Section 8–41–301(2), C.R.S. (2005), was added by the legislature in 1991, the same year as the benefits cap statute, and allows a worker to recover both temporary and permanent disability benefits upon a finding of mental impairment. This court determined that section 8–41–301(2)(b) limited compensation for permanent disability benefits to twelve weeks, but that the same section did not limit temporary disability benefits. *City of Thornton v. Replogle,* 888 P.2d 782 (Colo.1995). Mental injuries are accorded their own rating as explained in the AMA Guides. *See AMA Guides,* at 241. A mental injury rating, like a scheduled injury rating, is convertible to a whole person impairment rating according to the Colorado Code of Regulations on workers' compensation. Rule 12–5, 7 C.C.R. 1101–3 (2005).

The benefits caps provision, section 8–42–107.5, was enacted in 1991 to limit the total award a claimant receives for temporary and permanent partial disability. The differentiated caps represent a legislative attempt to distinguish between workers who are injured more and less seriously. *See Colorado AFL–CIO v. Donlon,* 914 P.2d 396, 403–04 (1996); Hearing on S.B. 218 First Conference Comm., 58th Gen. Assembly, 2d Reg. Sess. (Hearing Tape 91–32 May 3, 1991). The

benefits cap is applied after a claimant's temporary and permanent disability has been calculated. All injuries must be converted into whole person impairment ratings in order to reflect the extent to which an injury impacts the claimant's past wage loss and future ability to earn wages. *See Donlon,* 914 P.2d at 404.

Construing the benefits caps statute, the Industrial Claim Appeals Office ("ICAO") has held that the term "impairment rating" is not defined and is ambiguous. *See Schank v. Wizard,* W.C. No. 4–497–494 (I.C.A.O. Sept. 19, 2003); *Quackenbush v. Tenant Roofing Inc.,* W.C. No. 4–218–272 (I.C.A.O. June 19, 1998). In *Quackenbush,* the ICAO addressed whether a claimant's right arm injury should be treated as a 29% extremity impairment or converted to a 17% whole person impairment for purposes of the application of section 8–42–107.5, the benefits cap provision. W.C. No. 4–218–272. The ICAO held that the term "impairment rating" was ambiguous, and it determined that converting the extremity impairment rating into a whole person impairment was necessary in order to prevent giving greater benefits to less seriously injured workers in contravention of the legislative purpose behind the benefits cap provision. *Id.*

Likewise, in *Schank,* the ICAO held that, after the enactment of the 1999 amendments, the term "impairment rating" as used in the benefits cap provision remained ambiguous. The *Schank* panel rejected the employer's theory that the 1999 amendments compelled the conclusion that scheduled disabilities were irrelevant to the application of the benefits cap provision, and held that where a claimant sustained both scheduled and nonscheduled injuries, the scheduled injury was to be converted into a whole person impairment rating and combined with the nonscheduled injury to determine the appropriate benefits cap in accordance with *Quackenbush. Schank,* W.C. No. 4–497–494. Rejecting the employer's theory, the panel noted that *Mountain City Meat Co. v. Oqueda,* 919 P.2d 246 (Colo.1996), and *Quackenbush* remain viable for the proposition that the 1999 amendments did not alter the statutory requirement that medical impairment

ratings be completed in accordance with the AMA Guides as expressly authorized in section 8–42–101(3.7). *Schank*, W.C. No. 4–497–494; *see also* § 8–42–101(3.7) ("impairment ratings used under articles 40 to 47 of this title shall be based on the revised third edition of the American Medical Association Guides to the Evaluation of Permanent Impairment").

These decisions demonstrate that the benefits cap provision is separate and apart from the 1999 amendments that sought to overrule our decision in *Mountain City Meat* which expanded awards for permanent partial disability compensation where a worker sustains both scheduled and nonscheduled injuries. The decisions also support the practice of adhering to the AMA Guides, as directed by the workers' compensation statute and division regulations, to calculate and combine all impairment ratings. *See AMA Guides*, at xix-xx ("The Guides continue to espouse the philosophy that all physical and mental impairments affect the whole person, and therefore, all impairment ratings should be combined."); § 8–42–107(8)(c), C.R.S. (2005) ("the authorized treating physician shall determine a medical impairment rating as a percentage of the whole person based on the ... [AMA Guides]."). The majority contends that rather than interpreting the 1999 amendments to merely undo the effect of our *Mountain City Meat* decision, the amendments also prevent the inclusion of a mental impairment rating to calculate the benefits cap because the term "combine" has "special meaning." Maj. op. at 412.

The term "combine" is not defined in the statute and, in context, "combine" is ambiguous because it sometimes has a technical meaning within the workers' compensation scheme. *See Mountain City Meat*, 919 P.2d at 252 (discussing ambiguity in statutes). Specifically, the 1999 amendments clarify that mental injuries are limited to the compensation outlined in section 8–41–301(2), and that mental or emotional stress "shall not be combined with a scheduled or nonscheduled injury." § 8–42–107(7)(b)(III). Subsection (I) states that scheduled and nonscheduled injuries shall be compensated separately, and iterates that mental injuries are not to be "combined" with scheduled or nonscheduled injuries.

The majority states that the "key" to its analysis is a phrase in subsection 8–42–107(7)(b)(III) stating that "mental or emotional stress shall not be combined with a scheduled or nonscheduled injury." *See* maj. op. at 412. The majority points out, and I agree, that the same phrase does not appear in subsection (7)(b)(II). Describing the phrase as "unique," the majority declares that it "must have meaning." *Id.* That meaning, according to the majority, is that the phrase applies to the benefits cap statute, and mental stress cannot be included in calculating benefits subject to the cap. *Id.*

In my view, the phrase has meaning where the legislature placed it in the statute, and it has no application to the benefits cap provision. There was no need for the drafters to include identical language in subsection (7)(b)(II) and (III). Scheduled injuries are compensated "solely" on the basis of the schedule and nonscheduled injuries are compensated "solely" as medical impairment benefits. *See* § 8–42–107(7)(b)(II). If a claimant has both scheduled and nonscheduled injuries, "the losses shall be compensated on the schedule and the nonscheduled injuries shall be compensated as medical impairment benefits." § 8–42–107(7)(b)(I). When subsections (I), (II), and (III) are read together, the result is that scheduled, nonscheduled, and mental impairment benefits must be calculated separately and cannot be combined for purposes of permanent partial disability. Contrary to the majority, I cannot read subsection (III) of the 1999 amendments as legislative intent to amend the benefits cap provision.

In context, the prohibition against "combining" mental injuries with the physical injuries may mean either that (1) mental injuries cannot be added together with a scheduled or nonscheduled injury for purposes of permanent partial disability compensation, or (2) mental injuries cannot be included in the calculation of the "impairment rating" that determines the appropriate benefits cap. The former interpretation conforms to the context of the 1999 amendments and fits within the narrow title of the bill limited to permanent partial disabil-

ity benefits. So understood, the amendment explains the proper way to calculate permanent partial disability compensation, and does not affect the benefits cap provision. *See* § 8–42–107; *see also In re Breene*, 14 Colo. 401, 406, 24 P. 3, 4 (1890) ("If the title of a bill be limited to a particular subdivision of a general subject, the right to embody in the bill matters pertaining to the remaining subdivisions of such subject is relinquished."). Applying the 1999 amendments to the benefits cap requires the court to speculate that the legislature intended to change the benefits cap provision without any express language tying the two separate provisions together. The majority's interpretation also uses the 1999 amendments to create an implicit exception to the use of the AMA Guides in the benefits cap provision despite explicit directions to the contrary in sections 8–42–101(3.7) and 8–42–107(8). Such a reading renders the remaining provisions of the statute vulnerable to further statutory inconsistencies.

The legislative history of the 1999 amendments further supports my belief that no connection can be made between the amendments and the benefits cap. The testimony of the Senate sponsor of House Bill 99–1157, Senator Owen, and two supporters, John Berry, and Tim Jackson, shows that the bill's purpose was to eliminate the possibility of combining mental impairment ratings with scheduled or nonscheduled injury ratings in order to receive a formula benefit for permanent partial disability. Senator Owen stated:

> I think the heart of this bill ... is whether on scheduled or nonscheduled injuries, you consider mental impairment .... [T]he question is, should [mental impairment] be compensated along with the injury, or compensated as separate ...

Remarks of Senator Owen before the Senate State Veterans & Military Affairs Comm., 62d General Assembly, 1st Reg. Sess. (Hearing Tape 99–8–D Feb. 7, 1999). Likewise, proponent John Berry stated:

> That's what the bill does .... It also [inaudible] the way with what we fear as being a huge loophole, and that is allowing someone who has a scheduled benefit combined with a mental impairment benefit to go off the schedule and get a formula benefit

> .... [The bill] really is to ... prevent someone from indicating that they have a, their [sic] depressed about their scheduled injury and then using that depression to get a formula award.

*Id.* (statements of John Berry). Proponent Tim Jackson stated:

> This bill is designed to eliminate the mental stress award on physical injuries in worker's compensation, similar to the legislation that passed the full legislature in the last two sessions.

*Id.* (statements of Tim Jackson). The transcripts of the hearing on House Bill 99–1157 reveal that only a single person, a workers' compensation attorney testifying in opposition to the bill, was concerned with the possible connection between the enactment and the benefits cap statute. *See* Testimony of Bob Turner before the House Business Affairs & Labor Committee, 62d General Assembly, 1st Reg. Sess. (Hearing Tape 99–5–d Jan. 26, 1999). The testimony of a bill's opponent, however, is not indicative of legislative intent.

Finally, we must remember that the workers' compensation law serves an important public purpose. It must be "liberally construed to accomplish its humanitarian purpose of assisting injured workers and their families." *Mountain City Meat*, 919 P.2d at 252–53 (quoting *Colorado Counties, Inc. v. Davis*, 801 P.2d 10, 11 (Colo.App.1990), *aff'd sub nom. County Workers Compensation Pool v. Davis*, 817 P.2d 521 (Colo.1991)). Including mental disability in the "impairment rating" for purposes of the benefits cap provides fair compensation to seriously injured workers like Debra Dillard. Excluding mental disability rolls the clock back to the time when the state did not compensate mental disability.

For all of these reasons, I respectfully dissent from the majority's opinion and would reverse the decision of the court of appeals.

I am authorized to state that Justice MARTINEZ joins in this dissent.